[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 426.]

THE STATE OF OHIO, APPELLEE AND CROSS-APPELLANT, v. BIROS, APPELLANT AND CROSS-APPELLEE.

[Cite as *State v. Biros*, 1997-Ohio-204.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 96-423—Submitted January 22, 1997—Decided May 14, 1997.)

APPEAL and CROSS-APPEAL[1] from the Court of Appeals for Trumbull County, No. 91-T-4632.

_____

{¶ 1} On Thursday, February 7, 1991, at approximately 5:30 p.m., Tami Engstrom dropped off her one-year-old son, Casey, at her friend Sharon King's house before reporting to work at the Clover Bar in Hubbard, Ohio. Tami's mother, Mary Jane Heist, worked with Tami at the Clover Bar. Tami arrived at work at 6:30 p.m. Later, at approximately 9:30 p.m., Tami had to leave work due to illness. Heist relieved Tami so that she could go home early. However, instead of going directly home, Tami drove to the Nickelodeon Lounge in Masury, Ohio, to visit her uncle, Daniel Hivner, who was a regular patron at that tavern. Tami arrived at the Nickelodeon at approximately 10:00 p.m. She was wearing a black leather coat, a sweater, black pants, black shoes, black stockings or socks, and a $1,200 diamond cluster ring she had purchased from King a few weeks earlier. She was also carrying a small gray purse which, according to one witness, contained a significant amount of money.

{¶ 2} At the Nickelodeon, Tami had several drinks and spoke with Hivner and others. Kenneth Biros, appellant, arrived at the Nickelodeon at approximately 11:00 p.m., having earlier participated in a drinking event sponsored by the

_____

1. The discretionary cross-appeal of the state of Ohio is hereby allowed.

Nickelodeon and other bars. Appellant knew Hivner but was a stranger to Tami. By midnight, Tami had passed out, due to either sickness or intoxication, while seated at a table. She later fell off her chair and onto the floor. Hivner and appellant helped Tami back into her seat. At approximately 1:00 a.m., when the bar was closing, appellant and Hivner assisted Tami outside to the parking lot. Tami insisted on driving herself home, but Hivner took Tami's car keys upon determining that she was too intoxicated to drive. According to Hivner, appellant then volunteered to take Tami for coffee to help sober her up. Hivner handed Tami her purse and noticed that she was wearing her leather coat. At approximately 1:15 a.m., appellant and Tami left the Nickelodeon in appellant's car. Hivner remained at the bar after closing and waited for appellant to return with Tami. However, appellant never returned Tami to the Nickelodeon.

{¶ 3} Meanwhile, on February 7, at approximately 11:30 p.m., Andy Engstrom, Tami's husband, went to the Clover Bar to deliver a gift he had bought for Tami. However, Heist informed Andy that Tami had left work and had gone home sick. Andy drove home and discovered that Tami was not there. Andy then asked King to continue watching Casey while he went out to search for Tami. At approximately 1:00 a.m., Andy spoke with Tami's sister, Debra Barr, who suggested that Tami might have gone to the Nickelodeon. At 1:10 a.m., Andy called the Nickelodeon and was told that Tami and Hivner had already left the bar. Andy then went to sleep, assuming that Tami would soon return home. When he awoke later that morning, he discovered that Tami was still missing.

{¶ 4} On Friday, February 8, 1991, at or about noon, Andy and King went to the Nickelodeon to pick up Tami's car, which had been left there overnight. At some point, Andy learned that appellant had been the last person seen with Tami. Therefore, Andy drove to appellant's home and confronted appellant concerning Tami's whereabouts. Appellant told Andy that after he and Tami had left the Nickelodeon to get coffee, he tapped her on the shoulder and she "freaked out,     *

* * got out of the car and started running through these people's yards on Davis Street" in Sharon, Pennsylvania. The location where appellant claimed that Tami had jumped from the vehicle was approximately three- tenths of a mile from the Nickelodeon. Andy told appellant that he had already contacted the police in Sharon, Pennsylvania, and that he intended to file a missing person's report with the Brookfield Township (Ohio) Police Department. Andy told appellant that "'[i]f she [Tami] don't turn up right fast, they [the police] are going to come looking for you, and it's going to be your ass.'"

{¶ 5} Throughout the day on Friday, February 8, appellant told a number of witnesses similar stories concerning Tami's disappearance. Specifically, he told Tami's mother, Tami's brother, Tami's uncles, her friends, acquaintances, and others, that after he had left the Nickelodeon with Tami, she woke up, became frightened, jumped from his vehicle and ran between houses near Carpenter's Towing or Carpenter's Garage on Davis Street in Sharon, Pennsylvania. Appellant also indicated that he had initially chased after Tami but that he had been unable to catch her. Appellant told a number of these witnesses that he had abandoned the chase to avoid being caught while driving under the influence of alcohol. Several of the witnesses noticed fresh cuts or scratches on appellant's hands and a fresh wound over his right eye that had not been present the night before. Appellant explained that he had cut his hands because he had been locked out of his house and had to break a window, and that he had obtained the cut above his eye while chopping wood. Tami's brother threatened to kill appellant if Tami had been hurt in any way. One of Tami's uncles told appellant that if Tami had been hurt, he would "rip [appellant's] heart out." Tami's mother told appellant, "if you put one scratch on my daughter, I will * * * kill you." Appellant tried to comfort Heist by telling her, "Don't worry. Your daughter is going to be just fine. You wait and see." On Friday evening, appellant helped Tami's relatives search the area in Sharon, Pennsylvania, where he claimed to have last seen Tami.

{¶ 6} Appellant lived on King Graves Road in Brookfield Township, Ohio, with his mother, Jo Anne Biros, and his brother, Cury Biros. On Friday morning, February 8, appellant's mother found a gold ring on the bathroom floor. The next day, she asked appellant if he knew anything about the ring. Appellant claimed to know nothing about it. Appellant told his mother that the ring appeared to be made of "cheap gold." When appellant's mother responded that the ring was not cheap, appellant suggested that perhaps it had belonged to the girl who jumped out of his car early Friday morning. Appellant then took the ring and said that he would return it to the Nickelodeon. However, appellant never returned Tami's ring to the Nickelodeon. Rather, according to appellant, he hid the ring in the ceiling of his house.

{¶ 7} On Friday night, Cury Biros was at home watching television while appellant was outside in a pasture behind the house. Cury went outside and called to appellant to see what he was doing. Appellant responded that he was "watching stars." Cury then returned to the house and retired for the evening.

{¶ 8} On Saturday, February 9, Tami's family and friends spent hours searching for Tami in Sharon, Pennsylvania. They also searched a wooded area along the railroad tracks near appellant's home on King Graves Road. However, the search party was unable to uncover any clues concerning Tami's disappearance.

{¶ 9} On Saturday afternoon, police called appellant's home and left a message requesting that he come to the police station for questioning. After receiving the message, appellant drove to the police station to discuss Tami's disappearance with Brookfield Township and Sharon, Pennsylvania police officers. Police informed appellant that he was not under arrest and that he was free to leave at any time. During questioning, appellant reiterated the same basic story that he had previously told Tami's friends and relatives. Specifically, appellant told police that he had left the Nickelodeon with Tami in the early morning hours of February 8 to get coffee or food at some location in Sharon, Pennsylvania. Appellant claimed

that Tami had passed out in his vehicle after they left the Nickelodeon. Appellant told police that he stopped at an automated teller machine to withdraw some money and, at that point, Tami woke up and insisted that appellant drive her back to the Nickelodeon. Appellant told police that as he was driving on Davis Street in Sharon, Pennsylvania, Tami jumped from the vehicle and ran away. When asked whether Tami's purse might have been left in his vehicle, appellant responded that he had thoroughly cleaned the vehicle and had found no purse.

{¶ 10} At some point during the interview, Captain John Klaric of the Sharon Police Department began questioning appellant's version of the story. Klaric suggested to appellant that perhaps he (appellant) had made some sexual advance toward Tami which, in turn, may have caused her to jump from the vehicle. Appellant denied making any sexual advances. Klaric also suggested that perhaps appellant had made some sexual advance and that Tami had jumped from the car and struck her head. Appellant denied this as well. Upon further questioning, Klaric suggested that maybe an accident had occurred in which Tami had fallen out of the car and struck her head. At that point, appellant responded "yes," and admitted that he had done something "very bad." Klaric offered to speak with appellant alone. Appellant agreed, and indicated that he wanted to speak with Klaric outside the presence of other police officers. According to Klaric, after the other officers had left the room, appellant stated, "It's like you said, we were in the car together. We were out along the railroad tracks. I touched her on the hand. Then I went further. I either touched or felt her leg. She pushed my hand away. The car wasn't quite stopped. She opened the door and fell and struck her head on the tracks." Appellant told Klaric that Tami was dead and that the incident had occurred along the railroad tracks near King Graves Road in Brookfield Township. At that time, police informed appellant of his *Miranda* rights. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 11} After signing a written waiver of his *Miranda* rights, appellant repeated his story in the presence of Detective Rocky Fonce of the Brookfield Township Police Department. According to Fonce, appellant admitted that he had reached out and grabbed Tami while parked along the railroad tracks near his house on King Graves Road. Appellant told Fonce that Tami had then jumped out of the vehicle, fell, struck her head on the metal part of the railroad track, and died. Appellant told police that Tami's body was in Pennsylvania. When police asked appellant for the precise location of the body, appellant requested to speak with an attorney. After appellant consulted with counsel, he agreed to show police the location of Tami's body.

{¶ 12} In the early morning hours of Sunday, February 10, 1991, Pennsylvania and Ohio authorities discovered several of Tami's severed body parts in a desolate wooded area of Butler County, Pennsylvania. Police found other portions of Tami's body in a desolate wooded area of Venango County, Pennsylvania, approximately thirty miles north of the Butler site. Tami's head and right breast had been severed from her torso. Her right leg had been amputated just above the knee. The body was completely naked except for what appeared to be remnants of black leg stockings that had been purposely rolled down to the victim's feet or ankles. The torso had been cut open and the abdominal cavity was partially eviscerated. The anus, rectum, and all but a small portion of her sexual organs had been removed from the body and were never recovered by police.

{¶ 13} Forensic technicians, police and homicide investigators searched the area of the railroad tracks near King Graves Road where appellant had indicated that the incident with Tami occurred. There, investigators discovered a large area of bloodstained gravel near the railroad tracks. Investigators also found blood spatters on the side of one of the steel tracks. A number of other bloodstains were found in the same general area. Bloodstains and swabbings of blood collected at the scene were later tested and were found to be consistent with Tami's blood.

Additionally, investigators found what appeared to be part of the victim's intestines in a swampy area near the railroad tracks. DNA testing revealed that the intestines were, in fact, part of Tami's remains. Approximately one month later, police recovered Tami's black leather coat, which was found partially buried a short distance from the tracks. Two cuts or slash marks were found on or near the collar of the coat. Tami's house keys and a tube of lipstick were found in a shallow hole in close proximity to the coat. Police also found one of Tami's black leather shoes in the area of the railroad tracks. Dale Laux, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, found a single pubic hair inside Tami's shoe. Laux determined that the microscopic characteristics of that hair were consistent with the characteristics of known samples of Tami's pubic hair.

{¶ 14} Police also recovered a number of items during searches of appellant's residence. Investigators found a bloodstained pocket knife hidden in appellant's basement. A much larger knife was recovered from appellant's bathroom. Investigators also recovered a bloodstained coat from appellant's bedroom, which was later identified as the coat appellant had worn to the Nickelodeon. Forensic experts found numerous bloodstains on the front of the coat, and blood spatters inside the left sleeve. Bloodstains from appellant's pocket knife and coat were later tested and were found to be consistent with the blood of the victim. Additionally, authorities removed a pair of size eleven tennis shoes from a bedroom in appellant's home. Rodney M. Cole, a forensic scientist in the trace evidence section of the Ohio Bureau of Criminal Identification and Investigation, found a single hair embedded in a seam near the tread of one shoe. Cole compared the hair to known samples of hair from the victim's head. According to Cole, the hair from the tennis shoe was microscopically consistent with the known samples of hair from the victim's head.

{¶ 15} The automobile appellant had driven to the Brookfield Township Police Department was also searched. Forensic technicians found numerous

bloodstains consistent with the blood of the victim. Several other bloodstains found in the vehicle were determined to be consistent with appellant's blood. A small piece of human tissue, believed to be Tami's liver tissue, was found inside the trunk.

{¶ 16} Dr. William A. Cox, the Summit County Coroner, performed the autopsy of Tami's body. Cox testified that he was board certified in anatomic pathology, clinical pathology, forensic pathology, and neuropathology. Cox determined that the victim had suffered ninety-one premortem injuries which were indicative of a "severe beating" and "an attempt at sexual mutilation." He also found five stab wounds that had been inflicted immediately after the victim's death. Among the premortem wounds were at least five blunt force injuries on the top of the victim's head which, according to Cox, had been caused by an object such as fists or the handle of a knife. Other premortem wounds were found on the victim's breasts and in the area of her groin. Two premortem knife wounds were discovered near the nipple of the right breast. There were fine linear scratches and a premortem knife laceration or incised wound along the victim's face and, according to Cox, "[t]he way that is done is the blade of the knife runs down across the mouth [and] finally gets into the skin, into the soft tissues, then breaks the skin as it continues in the downward direction." Cox also found numerous wounds on the victim's hands which appeared to be "defensive" injuries.

{¶ 17} In addition to the ninety-one premortem wounds and the five postmortem stab wounds, Tami's head, right breast and right lower extremity had been severed from her body at some point after death. Her anus, rectum, urinary bladder, and virtually all of her sexual organs had been cut out and were never found. The gallbladder, the right lobe of the liver, and portions of the bowels had been extracted from her body. According to Cox, a pocket knife like the one removed from appellant's basement could have been used to inflict some of the wounds found on Tami's body. However, Cox found that a much larger or heavier knife had been used to amputate Tami's head and right lower extremity. Cox

testified that the victim's right femur had been severed by a sharp knife which had left a "fine linear cut" in the bone. Cox specifically determined that the evidence indicated that the femur had not been fractured by any blunt force trauma or as the result of an automobile accident. Cox testified that the knife recovered from appellant's bathroom was consistent with the type of knife that had been used to accomplish the amputations. Cox found that the dismemberment and eviscerations all occurred within minutes after the killer had inflicted the five postmortem stab wounds. He found no evidence that the victim had been struck by an automobile as appellant would later claim.

{¶ 18} With respect to Tami's cause of death, Cox concluded that the victim had died of asphyxia due to strangulation. According to Cox, the victim had been strangled to death over a period of four to five minutes. The mucosal lining of the esophagus was torn, indicating that there was a degree of retching and vomiting during this period. Cox testified that, in his opinion, the victim had not been asphyxiated by a hand placed over the nose and mouth. Examination of the victim's oral cavity revealed no signs of injury to the tongue or the delicate tissue inside the mouth. Absent such injuries, Cox found no evidence to support the theory that the victim had been forcibly suffocated as opposed to being strangled to death. Further, the hyoid bone had been fractured and there was injury to adjacent tissue, which supported the finding that the victim had been strangled. According to Cox, Tami was severely beaten, strangled to death, and then stabbed five times. The five postmortem stab wounds had occurred within minutes after death. Later, but still within minutes, the decedent's body was dismembered.

{¶ 19} Dr. Theodore W. Soboslay, the Trumbull County Coroner, was present during Tami's autopsy. Soboslay concurred with Cox's findings and officially ruled that the decedent had expired "due to asphyxiation, secondary to strangulation."

9

{¶ 20} Appellant was indicted by the Trumbull County Grand Jury for the aggravated (felony) murder of Tami. Count One of the indictment charged appellant with the purposeful killing of Tami during the commission of an aggravated robbery and attempted rape in violation of R.C. 2903.01(B). Count One of the indictment carried two R.C. 2929.04(A)(7) death penalty specifications. The first specification alleged that appellant had purposefully killed Tami while committing or fleeing immediately after committing an aggravated robbery. The second alleged that appellant had purposefully killed Tami while attempting to commit or while fleeing immediately after attempting to commit rape. Count Two of the indictment charged appellant with felonious sexual penetration in violation of former R.C. 2907.12(A)(2). Count Three of the indictment charged appellant with abuse of a corpse in violation of R.C. 2927.01(B). Appellant was also charged, in Counts Four and Five, with aggravated robbery and attempted rape, respectively. Prior to trial, the state of Ohio dismissed Count Three of the indictment which had charged a violation of R.C. 2927.01(B). Thereafter, the matter proceeded to trial before a jury.

{¶ 21} At trial, appellant testified in his own defense. Appellant claimed that when the Nickelodeon Lounge was closing at 1:00 a.m., February 8, Hivner asked appellant to take Tami for coffee or breakfast to help sober her up. Appellant agreed and left the Nickelodeon with Tami. He then drove into nearby Sharon, Pennsylvania, to withdraw cash from an automated teller machine. At some point, appellant reached over and shook Tami, since she had fallen asleep. Tami awoke and said that she wanted to go home. She told appellant that her home was in Hubbard, Ohio, but would not say exactly where she lived. Therefore, appellant decided to take Tami to his home to let her "sleep it off."

{¶ 22} Appellant testified that he decided on his way home to drive along the gravel railroad bed which would have taken him to within a few hundred feet of his residence on King Graves Road. While driving on the railroad bed, he

reached over and grabbed Tami's hand to wake her. According to appellant, Tami suddenly awoke, looked at him, and began yelling, "I don't know you. Where are we at?" She hit appellant and yelled at him. Appellant forcibly struck Tami with his forearm. Tami then fled from the vehicle and took off running along the railroad tracks. Appellant claimed that he drove along the railroad tracks to try to head Tami off to speak with her. However, according to appellant, he inadvertently struck Tami with the vehicle, causing her to topple over the car at a forty-five degree angle with her head positioned toward the gravel railroad bed. Appellant testified that he got out of the car and rolled Tami over onto her back. She was bleeding and her head was positioned against the steel rail of the railroad track. According to appellant, Tami pushed him and began screaming, swearing, and throwing rocks. At that point, appellant decided to pull out his pocket knife to "calm" Tami down. However, Tami grabbed the knife and a struggle ensued. Appellant cut his hand, but was able to regain control of the knife. Meanwhile, Tami continued to scream. Therefore, according to appellant, he pinned Tami down and placed his hand over her mouth until she stopped struggling. When appellant removed his hand from Tami's mouth, he realized that she had died. Appellant then became upset and frustrated, so he stabbed her several times.

{¶ 23} Appellant testified that after he had killed and stabbed Tami, he "panicked," drove home, tended to his wounds, and washed his clothes. Appellant testified that he returned to the body fifteen to twenty minutes later and became very angry, believing that Tami had "just destroyed my life." At that point, appellant took his pocket knife and began cutting Tami's body. Appellant claimed that he removed Tami's clothes because they were "in the way." Next, according to appellant, he dragged the body some distance into the woods, and felt Tami's ring cutting into his left hand. Thus, he removed the ring and placed it in his pocket. Appellant testified that he attempted to bury Tami's body in a shallow hole in the ground, but that the body would not fit into the hole. Therefore, he amputated the

head and leg with his pocket knife and placed those body parts in a separate hole. Appellant then placed Tami's clothes in other holes in the ground. After burying the body, appellant returned home.

{¶ 24} Appellant testified that later on Friday morning, February 8, 1991, he found Tami's purse in his car and burned the purse in the fireplace. He then washed his car. On Friday night, appellant decided to move the body, since he had been confronted and threatened by Tami's relatives. Late that night, while his brother (Cury Biros) was watching television, appellant retrieved Tami's body parts, loaded them into the car, and drove to Pennsylvania and disposed of the body.

{¶ 25} Appellant lied to police, to Tami's relatives, and to his own mother. At trial, appellant denied telling police at the Brookfield Township Police Department that while appellant and Tami were seated in the car, appellant had placed his hand on Tami's hand and then "went further" and touched or felt her leg. Appellant denied having had any sexual intentions toward Tami, but admitted cutting out her vagina and rectum thirty to forty-five minutes after he killed her. Appellant was able to recall some of the most minute details of the night in question, but was unable to remember where he had disposed of Tami's anus, rectum, and sexual organs. He also denied having had any intention of stealing Tami's property, but he admitted burying her clothes, taking her ring, and burning her purse. Additionally, appellant admitted lying to his mother about Tami's ring and later hiding that ring in the ceiling of his house. Appellant testified that he had no intention to kill or harm Tami on the night in question. He testified further that he never struck Tami with his fists or with the blunt end of a knife.

{¶ 26} Dr. Karle Williams, a forensic pathologist, testified for the defense. Williams was not present during Tami's autopsy and never personally examined the body. Williams based his opinions upon a review of, among other things, Dr. Cox's autopsy report and a review of numerous photographs of the victim and the crime scene. Williams disagreed, at least in part, with Cox's conclusion that Tami

had suffered a severe beating. Williams believed that perhaps Tami's right leg had been fractured before death and that some of her injuries may have been caused by being struck by a car and falling or lying on the gravel railroad bed. Additionally, Williams concluded that Tami may have died due to suffocation rather than manual strangulation. However, Williams admitted on cross-examination that, in this case, "you have to think of manual strangulation. Absolutely."

{¶ 27} The jury found appellant guilty of all charges and specifications alleged in the indictment, with the exception of the offense charged in Count Three of the indictment which had previously been dismissed by the prosecution. Following a mitigation hearing, the jury recommended that appellant be sentenced to death for the aggravated murder of Tami. The trial court accepted the jury's recommendation and sentenced appellant to death. For the remaining offenses, appellant was sentenced in accordance with law.

{¶ 28} On appeal, the court of appeals found that "[t]he record is completely devoid of evidence which would support a finding that appellant formed the intent to rob the victim prior to or during the acts which resulted in her death." On this basis, the court of appeals, relying on *State v. Williams* (Mar. 24, 1995), Trumbull App. No. 89-T-4210, unreported, 1995 WL 237092, affirmed in part and reversed in part (1996), 74 Ohio St.3d 569, 660 N.E.2d 724, held that the evidence was insufficient to prove aggravated robbery as one of the underlying felonies for the felony-murder charge in Count One of the indictment. Further, the court of appeals found that the trial court had erred in submitting to the jury, in the penalty phase, the R.C. 2929.04(A)(7) aggravating circumstance that the murder was committed in the course of an aggravated robbery. Nevertheless, the court of appeals upheld the sentence of death, finding that the remaining R.C. 2929.04(A)(7) aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. In addition to affirming appellant's aggravated murder conviction (with attempted rape as the underlying felony) and death sentence, the court of appeals also affirmed

appellant's other convictions, including the convictions on Counts Four and Five of the indictment for aggravated robbery and attempted rape, respectively.

{¶ 29} The cause is now before this court upon an appeal as of right and the state's cross-appeal.

————————————

*Dennis Watkins*, Trumbull County Prosecuting Attorney, *Patrick F. McCarthy* and *Deborah L. Smith*, Assistant Prosecuting Attorneys, for appellee and cross-appellant.

*David L. Doughten* and *Robert A. Dixon*, for appellant and cross-appellee.

————————————

**DOUGLAS, J.**

{¶ 30} Appellant presents twelve propositions of law for our consideration. Additionally, the state of Ohio has filed a cross-appeal challenging the court of appeals' findings of insufficiency of proof that the murder was committed while appellant was committing or while fleeing immediately after committing aggravated robbery. We have considered all of the propositions of law raised by the parties and have independently reviewed appellant's death sentence for appropriateness and proportionality. Upon review, and for the reasons that follow, we reverse the judgment of the court of appeals on the matters raised in the state's cross-appeal, affirm the judgment of the court of appeals in all other respects, and uphold the sentence of death.

I

{¶ 31} In his first proposition of law, appellant contends that he is not statutorily eligible for the death penalty because the specifications of aggravating circumstances alleged in the indictment omitted the language from R.C. 2929.04(A)(7) that "either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design." Appellant contends that

the omission of this language from the specifications of aggravating circumstances set forth in his indictment rendered that indictment "insufficient to sustain a capital charge." We do not agree.

{¶ 32} Initially, we note that appellant never objected at any time before or during his trial that the R.C. 2929.04(A)(7) specifications of aggravating circumstances were allegedly defective on the basis that they omitted an allegation either that appellant was the principal offender in the commission of the aggravated murder or, if not the principal offender, that he had committed the offense with prior calculation and design. Consequently, appellant's failure to timely object to the allegedly defective indictment constitutes a waiver of the issues involved. *State v. Joseph* (1995), 73 Ohio St.3d 450, 455, 653 N.E.2d 285, 291. See, also, *State v. Mills* (1992), 62 Ohio St.3d 357, 363, 582 N.E.2d 972, 980 ("Under Crim.R. 12[B] and 12[G], alleged defects in an indictment must be asserted before trial or they are waived."). Accordingly, our discretionary review of the alleged error must proceed, if at all, under the plain error analysis of Crim.R. 52(B). Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise. *Joseph* at 455, 653 N.E.2d at 291. See, also, *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899.

{¶ 33} Turning to the merits, we find that our recent decision in *Joseph,* 73 Ohio St.3d 450, 653 N.E.2d 285, is dispositive of appellant's contentions. In *Joseph*, Richard E. Joseph and Jose Bulerin were jointly indicted for the aggravated (felony) murder of Ryan Young. The indictment contained an R.C. 2929.04(A)(7) death penalty specification alleging that Joseph and Bulerin had committed the aggravated murder during the course of a kidnapping, and that the offenders were the principal offenders in the commission of the *kidnapping*. In *Joseph*, we found that the specification failed to correspond with the language of R.C. 2929.04(A)(7) because the specification should have indicated that the offenders were the principal offenders in the commission of the *aggravated murder*. *Id*. at 455, 653 N.E.2d at

291.  However, we found that the error did not render the indictment invalid, since the record clearly demonstrated that Joseph "had sufficient notice that he was being tried as a principal offender in the commission of the aggravated murder of Ryan Young while committing kidnapping."  *Id*. at 455-456, 653 N.E.2d at 291.  In *Joseph*, we went on to explain and hold that:

"The penalty for aggravated murder is life imprisonment or death.  R.C. 2929.02.  If the state desires to seek the death penalty for a defendant who commits aggravated murder, the indictment charging the offense must contain at least one of eight specifications enumerated in R.C. 2929.04(A)(1) through (8).  R.C. 2929.04(A) provides: 'Imposition of the death penalty is precluded, unless one or more of the following is specified in the indictment or the count of the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt.'  That section then sets out eight different aggravating circumstances.

"The form of the specification is governed by R.C. 2941.14(C), which requires that the aggravating circumstance 'may be stated in the words of the subdivision in which it appears, or in words sufficient to give the accused notice of the same.'  Thus, the language of the statute clearly provides that the specification is sufficient if the accused knows which subsection, or which aggravating circumstance of the eight listed in R.C. 2929.04(A) has been alleged.

"While the specification in the present case contained a technical error, we cannot find that this error rendered the indictment invalid, as the correct language of the specification was clearly ascertainable to appellant.  The indictment's aggravated-felony-murder count and specification recited an obvious and undeniable reference to R.C. 2929.04(A)(7) (the felony murder specification) as the capital specification * * *.  The indictment informed appellant of all elements comprising the capital offense of aggravated murder under R.C. 2901.03(B) [*sic*, 2903.01(B)], as the exact language of that section containing all the elements for that offense was correctly recited in the single count of the indictment.  Following

16

the count set forth in the indictment and pursuant to R.C. 2941.14, a capital specification was included, which stated verbatim the relevant language of R.C. 2929.04(A)(7), except for the substitutional error in the last word of the specification. However, appellant certainly had sufficient notice from the wording of the specification that the aggravating circumstance set forth in R.C. 2929.04(A)(7) was being alleged. In fact, appellant, his attorneys, the prosecutor, and the trial judge treated the indictment as valid at all stages of the proceedings, never noticing any flaw in the indictment. Thus, the record demonstrates that the wording of the specification was sufficient to give appellant notice that the state was required to prove that he was a principal offender in the commission of the aggravated murder of Ryan Young pursuant to the specification contained in R.C. 2929.04(A)(7).

"Furthermore, appellant has not shown that he was prejudiced in the defense of his case from this substitutional error or that he would have proceeded differently had this error been corrected. Indeed, had the error been discovered, it was properly subject to amendment. Crim.R. 7(D)." *Joseph*, 73 Ohio St.3d at 456-457, 653 N.E.2d at 291-292.

{¶ 34} In the case at bar, Count One of the indictment charged appellant with the aggravated (felony) murder of Tami Engstrom. The single count of aggravated murder carried two R.C. 2929.04(A)(7) death penalty specifications. The two specifications of aggravating circumstances expressly referred to R.C. 2929.04(A)(7) and stated, respectively, that "KENNETH BIROS committed the offense at bar [aggravated murder] while he was committing or fleeing immediately after committing Aggravated Robbery" and "KENNETH BIROS committed the offense at bar [aggravated murder] while he was attempting to commit or fleeing immediately after attempting to commit Rape." The specifications did not expressly track the language of R.C. 2929.04(A)(7), since there was no specific allegation that appellant was the "principal offender" in the aggravated murder or

that he had committed the offense with prior calculation and design. However, notwithstanding that omission, the indictment clearly provided appellant with adequate notice of the death penalty specifications with which he was being charged. The record clearly demonstrates that at all stages of the proceedings, appellant understood that he was being prosecuted for having personally killed Tami Engstrom during the course of an aggravated robbery and attempted rape. Appellant, defense counsel, the prosecution and the trial court treated the indictment as valid throughout the proceedings without noticing any defect in the specifications of aggravating circumstances. Moreover, appellant was indicted and tried on the basis that he had acted alone in the killing, without any accomplices. He was the only individual accused of killing Tami Engstrom and, as the only offender, appellant was, *ipso facto*, the "principal offender." Based upon the rationale and holdings in *Joseph*, we reject appellant's arguments concerning the sufficiency of the indictment.

{¶ 35} In this proposition, appellant also contends that the trial court erred by failing to instruct the jury that appellant must be found to be the principal offender of the aggravated murder offense to be found guilty of the R.C. 2929.04(A)(7) death penalty specifications. Additionally, appellant protests that the verdict forms failed to reflect that the jury found appellant to be the principal offender. However, appellant failed to object to the absence of the term "principal offender" in the jury instructions and verdict forms. Thus, these issues have been waived. Further, there is absolutely no evidence in this case to suggest that the aggravated murder of Tami Engstrom involved more than one offender. Indeed, appellant even admitted at trial that he had acted alone in causing the death of his victim. Thus, appellant was either the principal offender in the commission of the aggravated murder, or he committed no aggravated murder offense at all. We find that, under these circumstances, the omission of R.C. 2929.04(A)(7) "principal offender" language in the jury instructions and verdict forms was not outcome-

18

determinative. Accord *State v. Bonnell* (1991), 61 Ohio St.3d 179, 184, 573 N.E.2d 1082, 1087.

{¶ 36} Additionally, with respect to the charges in connection with Count One of the indictment, appellant argues that "[b]ecause the verdict forms failed to state the 'degree' (capital offense) of the charge or the additional elements, 'principal' or 'prior calculation or design,' the verdict constituted a finding of the 'least degree' of the offense charged, i.e. aggravated murder without specifications." Here, the jury returned a guilty verdict on Count One of the indictment, and the verdict clearly reflects that the charge upon which the verdict was returned was "aggravated murder." As the court of appeals recognized, "aggravated murder" *is* the degree of the offense with which appellant was charged in Count One of the indictment. See R.C. 2901.02(A). Separate verdict forms were also returned for each of the two specifications of aggravating circumstances in connection with Count One. Therefore, we reject appellant's contentions that the verdict forms are somehow defective for failing to state the degree of the offense charged.

{¶ 37} Accordingly, for the foregoing reasons, appellant's first proposition of law is not well taken.

II

{¶ 38} Prior to trial, appellant filed a motion to suppress the incriminating statements he had made to police during his February 9, 1991 interview at the Brookfield Township Police Department. The trial court denied appellant's motion to suppress. In his second proposition of law, appellant contends that the trial court committed reversible error in denying the motion since, according to appellant, his statements to police were obtained in violation of *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Specifically, appellant asserts that he was subjected to "custodial interrogation" before police advised him of his *Miranda* rights. We disagree.

**{¶ 39}** In *Miranda*, the United States Supreme Court held that:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (Emphasis added and footnote omitted.) *Id*. at 444-445, 86 S.Ct. at 1612, 16 L.Ed.2d at 706-707.

**{¶ 40}** Police are not required to administer *Miranda* warnings to everyone whom they question. *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719. "Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id*. Only *custodial*

20

interrogation triggers the need for *Miranda* warnings. *Id*. at 494, 97 S.Ct. at 713, 50 L.Ed.2d at 719. See, also, *Berkemer v. McCarty* (1984), 468 U.S. 420, 440-442, 104 S.Ct. 3138, 3150-3152, 82 L.Ed.2d 317, 335-336. The determination whether a custodial interrogation has occurred requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation." *Berkemer* at 442, 104 S.Ct. at 3151, 82 L.Ed.2d at 336. "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275, 1279. See, also, *State v. Barnes* (1986), 25 Ohio St.3d 203, 207, 25 OBR 266, 270, 495 N.E.2d 922, 925.

**{¶ 41}** The following matters were elicited at the hearing on appellant's motion to suppress. On Saturday, February 9, 1991, Lieutenant Frank Murphy of the Brookfield Township Police Department left a message on appellant's answering machine asking appellant to come to the police station to discuss the disappearance of Tami Engstrom. Police wanted to speak with appellant because he had been the last person to have seen Tami before her disappearance. Subsequently, Murphy asked Officer Marchio of the Brookfield Township Police Department to drive to appellant's residence to see whether appellant was home and to ask appellant to come to the police station. While en route to appellant's residence, Officer Marchio passed appellant on King Graves Road. Appellant informed Marchio that he was on his way to the police station. Appellant then continued on his way to the station, apparently unaccompanied by Marchio. After arriving at the station, appellant was taken to a small room for questioning. Appellant was informed that he was not under arrest and that he could leave at any time. During questioning, appellant eventually revealed to Captain John Klaric of the Sharon Police Department that something bad had happened and that Tami had died. Klaric then notified Detective Rocky Fonce of the Brookfield Township Police Department and Fonce advised appellant of his *Miranda* rights. At that time,

appellant acknowledged that he understood his rights and he agreed to waive them. Appellant then once again repeated his version of how Tami had died. He also stated that Tami's body was located in Pennsylvania. When police asked appellant to reveal the exact location of the body, appellant did not respond. Instead, appellant stated that he wanted to speak with an attorney. After conferring with counsel, appellant, his attorney, and the police reached an agreement whereby appellant voluntarily disclosed the exact location of Tami's body.

{¶ 42} Appellant argues that he was subjected to custodial interrogation from the beginning of his interview with police since, according to appellant, a reasonable person in his situation would have considered himself to be "in custody." To support this argument, appellant protests that "[o]fficers did not wait for [appellant] to voluntarily respond to their invitation [to come to the police station] but rather sent a car to look for him." Appellant also asserts that a custodial interrogation occurred because (1) "he was crowded into a small interrogation room with three officers," (2) he was asked to explain inconsistencies in his statements, (3) Klaric questioned appellant using interview techniques whereby he suggested certain scenarios that might have occurred between appellant and Tami Engstrom, (4) appellant was asked to take a polygraph test, and (5) police told appellant that he would feel better if he "got it out."

{¶ 43} The trial court denied appellant's motion to suppress on the basis that the interview conducted by the police did not constitute a custodial interrogation. The trial court found that appellant "came to the [station] voluntarily in his own vehicle. The evidence revealed he was not placed under arrest, booked, photographed, or fingerprinted." Further, the trial court found that appellant "was taken to an interview room and interviewed * * *. [Police] not only advised Defendant that he was not under arrest, but also that he could get up and leave at any time. This Court finds that the interview of Defendant did not constitute a custodial interrogation as outlined in *Oregon v. Mathiason* (1977), 429 U.S. 492."

22

{¶ 44} We find that the trial court did not err in reaching this conclusion. Officer Marchio was asked to go to appellant's residence merely to request that appellant come to the police station. Before Marchio actually arrived at appellant's residence, appellant was already voluntarily on his way to the station in his own vehicle. At the time, Tami was simply a missing person and appellant was the last individual known to have seen her. At the station, appellant was taken to an interview room and the door was not closed. Appellant was specifically advised that he was not under arrest and that he was free to leave at any time. During questioning, appellant eventually admitted that he was with Tami when she died. Appellant was never forced or compelled to respond to the questions posed by police. Clearly, appellant was not in custody at the time he admitted his involvement in Tami's death. There is absolutely no evidence to indicate that appellant was under arrest or that police imposed any restraint on his freedom of movement. Further, appellant was promptly advised of his *Miranda* rights when he admitted involvement in the death of Tami Engstrom.

{¶ 45} Appellant also contends that he was pressured by police to reveal the location of the body after he had requested to speak with an attorney. We disagree. When police asked appellant for the precise location of Tami's body, appellant requested to speak with an attorney. At that point, Detective Fonce terminated his interview with appellant. Appellant was also told by Captain Klaric that he would not be asked any further questions. Klaric then commented that appellant had "done the right thing" and that Tami's family deserved to know the location of the body. However, appellant was asked no further questions and Klaric's comment elicited no response from appellant. After consulting with counsel, appellant voluntarily revealed the exact location of Tami's body.

{¶ 46} We find no violation of *Miranda* on the facts of this case. Appellant was not in custody at the time he admitted his involvement in Tami's death. When appellant finally admitted involvement, he was properly advised of his *Miranda*

rights. After appellant requested to speak with his attorney, all further questioning ceased. Thereafter, appellant voluntarily agreed to reveal the location of the victim's body. Thus, we reject appellant's assertions that the trial court erred in denying the motion to suppress.

{¶ 47} Accordingly, appellant's second proposition of law is not well taken.

III

{¶ 48} In his third proposition of law, appellant argues that certain statements made by the trial court and by counsel during voir dire violated R.C. 2929.03(B). Specifically, appellant contends that "the trial court in the present case instructed numerous jurors, and allowed the attorneys to also instruct the jurors that a finding of guilt on at least one of the two specifications was necessary before the appellant could face the possibility of the death penalty." However, appellant did not object to these statements at trial and, thus, his arguments have been waived. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 40-41, 630 N.E.2d 339, 344. Additionally, as noted by the court of appeals, "appellant's counsel engaged in questioning of the potential jurors which was substantially similar to that questioning to which he now objects." Obviously, appellant cannot take advantage of an error he invited or induced. See *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408, 422.

{¶ 49} In any event, we find no reversible error. Here, appellant points to several instances during voir dire in which prospective jurors were informed of the possibility of a mitigation hearing in the event appellant was found guilty of aggravated murder and at least one of the specifications of aggravating circumstances. Appellant claims that discussing such matters with prospective jurors violates R.C. 2929.03(B), which provides that, in a capital case, the trial court's instructions to the jury "shall not mention the penalty that may be the consequence of a guilty or not guilty verdict on any charge or specification." However, "R.C. 2929.03(B) applies to the guilt phase of the bifurcated trial,

directing that during such phase the jury shall not be permitted to consider a possible penalty." *State v. Jester* (1987), 32 Ohio St.3d 147, 154, 512 N.E.2d 962, 970. Nothing in the statute indicates that it was intended to apply to voir dire. Further, as was the case in *Jester*, to apply R.C. 2929.03(B) in a manner suggested by appellant would needlessly complicate or render impossible the already difficult process of "death-qualifying" a jury. *Id.*

{¶ 50} Appellant has failed to demonstrate the existence of any error rising to the level of plain error, and, accordingly, we reject appellant's third proposition of law.

IV

{¶ 51} In his fourth proposition of law, appellant argues that the trial court erred by allowing the prosecution to peremptorily challenge two prospective jurors who expressed or indicated some aversion to the death penalty. However, we have held that "apart from excluding jurors based on race or gender, 'prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control.'" *State v. Ballew* (1996), 76 Ohio St.3d 244, 253, 667 N.E.2d 369, 379. Therefore, appellant's fourth proposition of law is not well taken.

V

{¶ 52} In his fifth proposition of law, appellant argues that the trial court abused its discretion by admitting into evidence nineteen gruesome photographic projection slides and five enlarged (approximately twelve by eighteen inches) gruesome photographs. Appellant contends that the photographs and slides were repetitive and cumulative in number, and that the prejudicial impact of the evidence far exceeded its probative value. Additionally, appellant contends that the photographs had been enlarged solely to inflame the passions of the jury. We find no merit to appellant's contentions.

{¶ 53} Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d

107, 121, 559 N.E.2d 710, 726. In *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus, we held that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." See, also, *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267, 273-274. Further, gruesome photographic projection slides of a victim are not *per se* inadmissible. See, generally, *State v. Thompson* (1987), 33 Ohio St.3d 1, 9, 514 N.E.2d 407, 415-416; and *Joseph*, 73 Ohio St.3d at 460, 653 N.E.2d at 294. Nor does size alone automatically increase the prejudicial aspect of the photographic evidence in question. See, generally, *State v. Gumm* (1995), 73 Ohio St.3d 413, 425, 653 N.E.2d 253, 265; and *State v. DePew* (1988), 38 Ohio St.3d 275, 282, 528 N.E.2d 542, 551.

{¶ 54} In the case at bar, the jury viewed nineteen autopsy slides which were projected on a screen during the testimony of Dr. William Cox, the Summit County Coroner. Virtually all of the slides showed the victim's body and body parts and were, in fact, gruesome. The slides were used to illustrate Dr. Cox's testimony and corroborated his conclusions that, among other things, the victim had been severely beaten and that there had been an attempt at sexual mutilation.

{¶ 55} Nevertheless, appellant would have us believe that there were no contested issues concerning the cause and manner of the victim's death and that the photographs and slides had absolutely no relevance to any factual matters at issue. However, the record belies appellant's assertions in this regard.

{¶ 56} At trial, appellant admitted causing the victim's death, but claimed that he had simply placed his hand over the victim's mouth and had accidentally killed her. The testimony of Dr. Karle Williams, the defense pathologist,

discounted some of the state's evidence of a severe beating, and appellant testified that he never struck Tami with his fists or with the blunt end of a knife. The defensive wounds and the numerous lacerations, abrasions, avulsions, and contusions depicted in the slides and photographs supported Cox's testimony. Specifically, the wounds depicted in the slides, combined with Cox's expert testimony, confirmed that the victim had been severely beaten. Appellant also testified that he had cut apart Tami's body in a blind rage, using only a pocket knife. Conversely, the slides and photographs demonstrate relatively meticulous incisions, particularly in the area where appellant had removed, among other things, the victim's vagina. Cox testified that a second and much larger knife had been used in the amputations, and the slides and photographs helped prove that point. Cox found no evidence that the victim had been struck by a car. Appellant claimed that he had inadvertently struck Tami with his car. Williams testified that the victim may have been struck by a car and concluded that the victim's leg may have been fractured prior to death. Cox found that the victim had died from strangulation. Williams believed that the victim may have been suffocated -- not strangled. The suffocation theory tended to support appellant's claims of an accident. Again, the slides and photographs supported Cox's conclusions that the victim's death was no accident. Additionally, Cox found signs of an attempt at sexual mutilation. Appellant, who stood accused of attempted rape, denied any sexual intentions toward Tami.

{¶ 57} Upon review of the photographic evidence and the events at trial, we find that the wounds depicted in the slides and photographs were probative of contested issues of intent, purpose, motive, and the cause, manner and circumstances of the victim's death. Although gruesome, the photographic evidence of the victim's body and body parts was highly probative, and the value of that evidence clearly outweighed the danger of unfair prejudice.

**{¶ 58}** Moreover, before allowing the jury to view the slides, the trial court had reviewed *in camera* thirty-one autopsy slides that had been offered by the prosecution. The record is clear that the trial court carefully examined each slide and entertained arguments by the prosecution and defense regarding the repetitive nature of some slides. Only nineteen of the thirty-one slides were shown to the jury. We agree with the court of appeals' finding that the slides were neither repetitive nor cumulative and that, in fact, "[t]he number of slides [was] kept to a minimum in relation to the factual issues in dispute." As to the five enlarged photographs, the court of appeals held, the state concedes, and we agree, that these five photographs were repetitive of some slides. However, these photographs were admitted into evidence as *substitutes* for the slides, and were made available to the jury for use during deliberations *in lieu of* the slides. Further, the trial court's charge to the jury at the conclusion of the guilt phase included a cautionary instruction informing the jury that "these photos are introduced in order to show you what has been described as premortem and postmortem injury. These photos are introduced for this purpose and this purpose only."

**{¶ 59}** In addition, we find nothing in the record to support appellant's contentions that the photographic evidence at issue had been enlarged to inflame the passions of the jury. There is nothing in the record to suggest that the prosecution intended to inflame the jury or that the passions of the jury became inflamed as a result of the evidence. Indeed, the record is clear that the prosecution exercised extreme care with respect to the exhibits offered into evidence and that the trial court exercised sound discretion in deciding which exhibits to admit.

**{¶ 60}** For the foregoing reasons, we find that the trial court did not abuse its discretion in admitting the slides and photographs into evidence. Accordingly, we reject appellant's fifth proposition of law.

VI

{¶ 61} In his sixth proposition of law, appellant contends that the evidence was insufficient to support a finding of attempted rape. On this basis, appellant seeks reversal of his attempted rape conviction as well as the finding of guilt on the R.C. 2929.04(A)(7) specification that the killing had occurred while appellant was committing attempted rape. In reviewing the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573.

{¶ 62} Appellant relies on *State v. Heinish* (1990), 50 Ohio St.3d 231, 553 N.E.2d 1026, to support his claim that the evidence in the present case is legally insufficient to sustain a finding of attempted rape. In *Heinish*, a majority of this court reversed an aggravated murder conviction on the basis that the state had failed to adduce sufficient proof of attempted rape, which was the only felony underlying the aggravated murder charge considered in that case. *Id*. at 238-239 and 241, 553 N.E.2d at 1034-1035 and 1037. In *Heinish*, the victim was found with her jeans partially unzipped and pulled partially down from her waist. Her blouse was partially up from the waist. She was wearing no underwear and no shoes. A saliva stain which could have come from the defendant was found on the outside of the victim's jeans. The majority in *Heinish* concluded that these facts were legally insufficient to sustain Heinish's attempted rape conviction. *Id*. at 238-239, 553 N.E.2d at 1034-1035. Appellant suggests that the evidence of attempted rape in *Heinish* was even more compelling than the evidence of the attempted rape in the case at bar.

{¶ 63} Conversely, the state contends, and we agree, that the evidence of attempted rape in the case at bar (1) far exceeds the evidence of attempted rape in *Heinish*, (2) is even more compelling than the facts and circumstances found sufficient to support a rape and aggravated murder conviction in *State v. Durr*

(1991), 58 Ohio St.3d 86, 568 N.E.2d 674, and (3) is at least as compelling as the evidence found sufficient to support an attempted rape and aggravated murder conviction in *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524.

{¶ 64} In *Durr*, 58 Ohio St.3d at 93, 568 N.E.2d at 682, a majority of this court upheld Durr's rape conviction and rejected a claim of insufficiency of proof, stating:

"In this case, the prosecution presented highly probative circumstantial evidence. Except for a pair of tennis shoes, the victim's body was found nude from the waist down. In addition, Deborah Mullins testified that when she saw Angel [the victim] tied up in the back of appellant's car, appellant informed Deborah that he was going to kill Angel because she would tell. Based upon these facts, we believe that there was sufficient probative evidence from which a rational trier of fact could have found the appellant guilty of rape beyond a reasonable doubt."

{¶ 65} It is important to note that *Durr* was decided after *Heinish* had been decided. Additionally, both *Heinish* and *Durr* were decided under the former rule that convictions based solely on circumstantial evidence may be sustained only where the evidence excluded all reasonable hypotheses of innocence. In *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, we abandoned that former rule and held that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof." *Id.* at paragraph one of the syllabus.

{¶ 66} More recently, we unanimously held, in *Scudder*, 71 Ohio St.3d at 274-275, 643 N.E.2d at 533, that the following facts and circumstances were "clearly sufficient" to support a finding of attempted rape:

"[A]ppellant [Scudder] suggests that the evidence was insufficient to support a finding of attempted rape. We disagree. Appellant's sexual interest in Tina [the victim] was apparent. The evidence indicated that appellant desperately wanted to be alone with Tina. Tina was found with her pants at her ankles and her

panties at midthigh. The evidence indicated that Tina had been forcibly undressed. The killer had apparently raked his fingers over Tina's stomach and downward toward the pubic region. Bloody hand marks were found on Tina's thighs, indicating that the killer had tried to force Tina's legs apart. Appellant's blood was found on Tina's body and clothing. A drop of appellant's blood had apparently dripped onto Tina's face while she was still alive, and while appellant was standing directly above her. This evidence was *clearly sufficient* for a reasonable jury to conclude that appellant attempted to rape Tina." (Emphasis added.)

{¶ 67} The evidence of attempted rape in the case at bar is at least as compelling as the evidence of the attempted rape in *Scudder*. Here, there was an abundance of highly probative evidence which, if believed, was sufficient for any rational trier of fact to have found that appellant attempted to rape Tami beyond a reasonable doubt.

{¶ 68} By his own admission, appellant drove Tami to a secluded area near his home while she was sleeping and without her consent. There was evidence that appellant told Captain John Klaric that while he and Tami were seated in the car, appellant reached over and touched Tami's hand and then "went further" and either touched or felt her leg. Appellant told Detective Rocky Fonce that he had reached over and grabbed Tami in the car. Appellant testified that he did not make any sexual advances toward Tami and that he never told police he had attempted to go "further" with her. However, the credibility of the witnesses was a matter for the jury to determine. This jury apparently disbelieved much of appellant's testimony concerning the events leading up to and culminating in the victim's death.

{¶ 69} Tami was found completely unclothed except for remnants of black leg stockings which appeared to have been forcibly rolled down to her feet or ankles. When police recovered Tami's leather coat, there were two discernible cut marks on or near the collar. No other cut marks were noted anywhere else on the garment. The medical evidence established that Tami had been stabbed five times

within minutes after her death. Some of the stab wounds were located in the area of the chest and abdomen. According to appellant, Tami was fully clothed at the time he inflicted the postmortem stab wounds. However, the absence of any coinciding punctures in the material of Tami's coat supports the inference that the coat had been removed at some earlier point during the attack. Tami's sweater, pants, and undergarments were never found, and appellant's concealment or destruction of this and other evidence can be viewed as suggestive of appellant's consciousness of guilt. Evidence was presented which, if accepted, revealed that Tami had been severely beaten and strangled by appellant and that there had been an attempt at sexual mutilation. A knife had been run down across Tami's mouth. There were two premortem knife wounds near the nipple of the right breast. There were other premortem injuries to the breasts and in the area of the groin. The anus, rectum, right breast, and virtually all of the sexual organs had been removed from the torso within minutes after death. Appellant was able to lead police to the various locations of Tami's dismembered body parts but, for some reason, he claimed not to recall what he had done with the anus, rectum, vagina, and sexual organs. A reasonable inference to be derived from the evisceration of Tami's sexual organs is that appellant was attempting to conceal evidence of rape or attempted rape. As the court of appeals so ably recognized, "[the] facts evince lasciviousness and, further, the evisceration of the sexual organs is suggestive of concealment of consummated purpose."

{¶ 70} Viewing the evidence and the reasonable inferences to be derived therefrom in a light most favorable to the prosecution, we find that the evidence of record was clearly sufficient for a rational jury to conclude beyond a reasonable doubt that appellant purposefully killed Tami during the commission of an attempted rape. Accordingly, we reject appellant's sixth proposition of law.

VII

**{¶ 71}** In his seventh proposition of law, appellant contends that the evidence was insufficient to sustain his conviction for aggravated robbery and the R.C. 2929.04(A)(7) specification premised on aggravated robbery because, according to appellant, he never had any intention to steal Tami's property (the diamond ring) until after he had killed her. The court of appeals agreed, in part, holding that although the evidence was sufficient to sustain appellant's conviction for aggravated robbery, the aggravated robbery could not serve as one of the underlying felonies for the felony-murder charge and that the trial court had erred in submitting to the jury, in the penalty phase, the R.C. 2929.04(A)(7) aggravating circumstance that the murder was committed during the course of the aggravated robbery. In reaching its conclusions concerning the insufficiency of proof, the court of appeals relied on the fact that there was no evidence to demonstrate that appellant had "formed the intent to rob the victim prior to or during the acts which resulted in her death." Specifically, the court of appeals apparently construed the term "while," as that term appears in R.C. 2903.01(B) and 2929.04(A)(7), as requiring proof that appellant intended to rob Tami at the time he killed her.

**{¶ 72}** The state agrees with the court of appeals' determination that there was sufficient evidence to sustain appellant's conviction for aggravated robbery, but vehemently disagrees with the court of appeals' remaining conclusions outlined above. The state's sole proposition of law on cross-appeal reads:

"Under both R.C. §2903.01(B) and R.C. §2929.04(A)(7), the evidence need not establish that an offender formed an intent to commit an aggravated robbery at or prior to the time he committed an aggravated murder in order to support a conviction so long as the aggravated robbery was committed 'while' the offender was committing aggravated murder."

**{¶ 73}** The court of appeals' findings of insufficiency of proof that the murder was committed *while* appellant was committing or fleeing immediately after committing aggravated robbery were based upon that court's reliance upon its

earlier decision in *Williams*, Trumbull App. No. 89-T-4210, unreported, 1995 WL 237092, which has since been reversed in relevant part. See *State v. Williams* (1996), 74 Ohio St.3d 569, 660 N.E.2d 724. In *our* decision in *Williams* at 576-578, 660 N.E.2d at 732-733, we specifically rejected any notion that R.C. 2903.01(B) and 2929.04(A)(7) require proof that the offender formed the intent to commit the pertinent underlying felony before or during the commission of the acts which resulted in the murder victim's death. We held that: "Neither the felony-murder statute nor Ohio case law requires the intent to commit a felony to precede the murder in order to find a defendant guilty of a felony-murder specification." *Id*. at paragraph one of the syllabus. Further, in *Williams*, we stated that:

"This court has had occasion to explain the meaning of the word 'while' with respect to R.C. 2903.01(B), stating:

""'The term 'while' does not indicate * * * that the killing must occur at the same instant as the [underlying felony], or that the killing must have been caused by [it], but, rather, indicates that the killing must be directly associated with the [underlying felony] as part of one continuous occurrence * * *." * * *' *State v. Cooey* (1989), 46 Ohio St.3d 20, 23, 544 N.E.2d 895, 903, quoting *State v. Cooper* (1977), 52 Ohio St.2d 163, 179-180, 6 O.O.3d 377, 386, 370 N.E.2d 725, 736." *Williams*, 74 Ohio St.3d at 577, 660 N.E.2d at 733.

{¶ 74} Here, appellant testified that fifteen to twenty minutes after he killed Tami, he began cutting her body and removing her clothes. The medical evidence confirmed that Tami had been eviscerated minutes after death. After cutting the body, appellant dragged the corpse into the woods. According to appellant, as he was dragging the body from the scene, he took Tami's ring from her finger and placed the ring in his pocket. Appellant claimed that he did not intend to steal the ring. However, the fact that appellant took the ring gives rise to the inference that he intended to keep it, and the fact that he intended to keep the ring is supported by other inferences arising from his later activities with regard to that property. After

removing the ring from Tami's finger, appellant continued dragging the body through the woods until he arrived at his intended location, severed the head and right lower extremity for ease of burial, and buried the body.

**{¶ 75}** Viewing the evidence and the reasonable inferences to be derived therefrom in a light most favorable to the prosecution, it is clear that any rational finder of fact could conclude that appellant committed an aggravated robbery[2] beyond a reasonable doubt. Even appellant's own testimony was sufficient to show the commission of an aggravated robbery offense. Specifically, appellant knowingly obtained or exerted control over Tami's ring without her consent and, at least inferentially, with the purpose to deprive her of that property. Thus, the evidence was sufficient to show that appellant committed a "theft offense" as that term is defined in former R.C. 2913.01 (see former R.C. 2913.02[A][1]) and that appellant had a deadly weapon on or about his person or under his control the entire time. Former R.C. 2911.01(A).

**{¶ 76}** Moreover, the evidence was indeed sufficient to support a finding that the killing was "associated with" the aggravated robbery and the attempted rape "as part of one continuous occurrence." *Williams*, 74 Ohio St.3d at 577, 660 N.E.2d at 733. Evidence was presented which, if accepted, clearly shows that appellant beat Tami, attempted to rape her, and strangled her to death. Appellant's testimony was that he began cutting Tami's body after he killed her, took her ring as he was dragging the body away, severed the head and leg, and then buried Tami's

---

2. At the time of the offense, former R.C. 2911.01 provided:

"(A) No person, in attempting or committing a *theft offense, as defined in section 2913.01 of the Revised Code*, or in fleeing immediately after such attempt or offense, shall do either of the following:

"(1) Have a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control;

"(2) Inflict, or attempt to inflict serious physical harm on another.

"(B) Whoever violates this section is guilty of aggravated robbery, an aggravated felony of the first degree." (Emphasis added.) 140 Ohio Laws, Part I, 583, 590.

body parts. Thus, even by appellant's own testimony, his theft of the ring was *associated with* the killing *as part of one continuous occurrence*. Appellant cannot escape the effect of the felony-murder rule by claiming that the aggravated robbery was simply an afterthought. "[T]he victim of an aggravated robbery, killed just prior to the robber's carrying off her property, is nonetheless the victim of an aggravated robbery. The victim need not be alive at the time of asportation." *State v. Smith* (1991), 61 Ohio St.3d 284, 290, 574 N.E.2d 510, 516. Appellant's intent to steal need not have preceded the murder for purposes of R.C. 2903.01(B) and 2929.04(A)(7). *Williams*, 74 Ohio St.3d 569, 660 N.E.2d 724.

{¶ 77} Accordingly, we reject appellant's seventh proposition of law and, in accordance with our decision in *Williams*, we reverse the judgment of the court of appeals with respect to the issues raised in the state's cross-appeal.

VIII

{¶ 78} Dale Laux, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, found blood spatters on the side of a steel railroad track at the crime scene, blood spatters inside the left sleeve of appellant's coat, and two cut marks or defects on or near the collar of Tami's black leather coat. At trial, Laux was permitted to testify as an expert concerning these and other matters. Laux testified that the blood spatters on the rail of the track and the spatters inside the left sleeve of appellant's coat were "typical of" and "consistent with" a beating. He also testified that blood spatters of the type found inside the left sleeve of appellant's coat are typically generated in a situation where the person wearing the coat holds down a victim using the left hand while beating the victim with the right hand. Laux testified further that Tami's black leather coat had two cut marks (as opposed to tears) on or near the collar. However, Laux was not permitted to render an expert opinion as to how the cuts had occurred.

{¶ 79} In his eighth proposition of law, appellant claims that although Laux is an undisputed expert in the field of blood typing, he lacked proper qualifications

to render an expert opinion concerning blood-spatter evidence and the fact that Tami's jacket had been cut rather than torn. Appellant further suggests that blood-spatter analysis is not a proper subject for expert testimony. However, the admission of expert testimony is a matter committed to the sound discretion of the trial court. See *Williams,* 74 Ohio St.3d at 576, 660 N.E.2d at 732. Further, we have indicated in a previous capital case that blood-spatter analysis is indeed a proper subject for expert testimony. See *Scudder*, 71 Ohio St.3d at 267-270 and 280, 643 N.E.2d at 528-530 and 537 (finding no abuse of discretion in allowing testimony of an expert in blood-spatter analysis, and also rejecting Scudder's twenty-eighth proposition of law, which had alleged error in the admission of expert opinion testimony in the area of blood-spatter interpretation). Moreover, we note that although appellant generally objected at trial to some of Laux's conclusions concerning blood spatters, he never specifically objected to Laux's qualifications to render such opinions or challenged blood-spatter analysis as a proper subject for expert testimony. Appellant's failure to object to Laux's qualifications as an expert, and to blood-spatter analysis as a proper subject for expert testimony, constitutes a waiver of the issues involved. See *Campbell,* 69 Ohio St.3d at 40-41, 630 N.E.2d at 344.

{¶ 80} In any event, "'[u]nder Evid.R. 702, an expert may be qualified by *knowledge, skill, experience, training, or education* to give an opinion which will assist the jury to understand the evidence and determine a fact at issue.'" (Emphasis *sic.*) *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 362, 662 N.E.2d 311, 325, citing *State v. Beuke* (1988), 38 Ohio St.3d 29, 43, 526 N.E.2d 274, 289. In the case at bar, Laux testified that he had over eleven years' experience as a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation. In that capacity, he has been involved in the analysis of bloodstains, semen stains, and the examination and analysis of trace evidence such as hairs and fibers. He has attended numerous training classes in the areas of bloodstain and trace-evidence

analysis at the Federal Bureau of Investigation Academy in Quantico, Virginia. He has also attended classes in bloodstain analysis at the Serological Research Institute in California. He has attended numerous seminars and workshops in the areas of his expertise. He holds both a Bachelor of Science and a Master of Science degree. During his career, Laux has been involved in several thousand cases dealing with blood analysis and trace evidence and has written several articles for scientific journals regarding, among other things, bloodstain analysis. Laux testified that he had taught a workshop in blood-spatter analysis and had generated spatters of the type at issue in this case. Additionally, with respect to the cuts on the collar of Tami's coat, Laux had personally examined the garment. Laux testified that he had evaluated cuts and marks on similar items during the course of his work as a forensic scientist and that he had previously offered his opinions on such matters in other cases.

{¶ 81} We find that the trial court did not abuse its discretion in allowing the expert testimony in light of Laux's extensive knowledge, experience, training, and education as a forensic scientist. We also note, in passing, that the fact that appellant severely beat Tami before he killed her was demonstrated by overwhelming evidence at trial, with or without Laux's expert testimony on the subject of blood-spatter interpretation. Thus, it is clear that appellant cannot demonstrate plain error with respect to Laux's expert testimony that the blood spatters found on the railroad track and the spatters of blood inside appellant's coat were consistent with a beating. Accordingly, we find no error, plain or otherwise, and we reject appellant's eighth proposition of law.

IX

{¶ 82} In his ninth proposition of law, appellant complains of several instances of alleged prosecutorial misconduct which, according to appellant, deprived him of a fair trial. We disagree.

{¶ 83} During the state's opening argument in the guilt phase, the prosecutor commented that the victim's body had not been disturbed by animals prior to being recovered by police. In the guilt phase, the prosecutor elicited testimony from Pennsylvania State Trooper Daniel Keith Johnson that there were no signs of animal bites on any of the body parts recovered from Pennsylvania. The prosecutor also questioned Dr. Cox on this issue, and Cox noted that there was no evidence that animals had tampered with the body.

{¶ 84} Appellant argues that the prosecutor's remark during opening arguments was improper and inflammatory, and that Johnson's testimony regarding animal bites was "completely irrelevant." We reject appellant's arguments in this regard. The prosecutor's remark was not improper and was later substantiated by testimony in the guilt phase. If the prosecutor had not negated the possibility of damage by animals, appellant may have attempted to argue that tampering by animals contributed to the condition of Tami's body. The testimony of Trooper Johnson and Dr. Cox was relevant to negate mutilation by wildlife as a possible alternative source of damage to the body. Thus, we find no prosecutorial misconduct with respect to the prosecutor's remark and the above testimony.

{¶ 85} In this proposition of law, appellant also complains of four additional instances of alleged prosecutorial misconduct that occurred during the guilt phase. According to appellant, the following four instances of alleged misconduct involved the improper introduction of victim-impact evidence in the guilt phase and/or gave rise to matters that were "entirely irrelevant to the guilt or innocence of [the] defendant."

{¶ 86} The first instance of alleged misconduct occurred during the prosecutor's cross-examination of appellant in the guilt phase when the prosecutor referred to appellant's initial failure to tell police the location of Tami's body. The prosecutor's reference clearly did not constitute victim-impact evidence. Further, the trial court sustained an objection to the prosecutor's remark and instructed the jury to disregard the statement. We presume that the jury followed the trial court's instruction in this regard. Thus, no prejudicial error resulted from this single remark by the prosecutor.

{¶ 87} The second instance of alleged misconduct also occurred during the cross-examination of appellant. Specifically, the prosecutor asked appellant if Tami had cried on the night in question and whether she had asked appellant to "please stop." Appellant failed to object to these questions and, thus, his arguments have been waived. Further, we find that the prosecutor's questions were not improper. Appellant testified on direct examination that Tami had hit him, yelled at him, and had thrown rocks at him. Appellant portrayed Tami as the initial aggressor. Appellant claimed that he had acted merely to defend himself from Tami, and that he had attempted to calm Tami down. However, given Tami's defensive injuries, the fact of her resistance was clear. The prosecutor's questions whether Tami had cried and had asked appellant to "please stop" were relevant to the circumstances surrounding her death.

{¶ 88} The third instance of alleged misconduct occurred when the prosecutor asked appellant during cross-examination whether appellant had given any thought to Tami, her family, or her friends while burying the body at the crime scene. We find that the prosecutor's question was improper and that it was completely irrelevant to the issue of appellant's guilt or innocence. However, defense counsel immediately objected to the inquiry, and the jury was promptly instructed to disregard the question. We presume that the jury followed the trial

court's instruction in this regard. Moreover, it is clear to us that this comment by the prosecutor did not operate to deny appellant a fair trial.

{¶ 89} The fourth instance of alleged misconduct occurred when the prosecutor commented during final closing arguments in the guilt phase that, unlike appellant, Tami did not have the opportunity to testify. The trial court sustained an objection to the prosecutor's comment. Although the prosecutor's comment was improper, it tended to state a rather obvious fact of which everyone was already aware. No prejudicial error resulted from this remark by the prosecutor.

{¶ 90} We find that the foregoing instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair trial. Indeed, we are in total agreement with the court of appeals that "[g]iven the insubstantial nature of the errors, the corrective actions of the court, and the weight of the evidence against appellant, it is clear beyond a reasonable doubt that the prosecutor's behavior did not have an effect on the outcome of the trial." Accordingly, appellant's ninth proposition of law is not persuasive.

X

{¶ 91} In his eleventh proposition of law, appellant claims that the trial court erred in instructing the jury that the jury's sentencing decision in the penalty phase was a "recommendation." Appellant also argues that certain remarks by the prosecutor concerning the jury's role in the sentencing process constitute reversible error. However, the argument appellant now raises has been considered and rejected by this court under analogous circumstances on a number of previous occasions. See, *e.g.*, *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81, and *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 656 N.E.2d 643, 669. As appellant presents no compelling argument why we should now change our position on this issue, we reject appellant's eleventh proposition of law.

XI

{¶ 92} In his tenth proposition of law, appellant contends that he was deprived of the effective assistance of trial counsel. Appellant claims that counsel was deficient for failing to object to the alleged errors that are the subject of his first, third and eleventh propositions of law. However, with respect to these propositions of law, we have found either no error or no prejudicial error. Thus, we find that appellant has failed to meet his burden of establishing ineffective assistance of counsel under the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accordingly, we reject appellant's tenth proposition of law.

## XII

{¶ 93} In his twelfth proposition of law, appellant argues that Ohio's death penalty scheme is unconstitutional. We have held, time and again, that Ohio's death penalty scheme is constitutional. As appellant presents us with no compelling argument why we should now find Ohio's death penalty statute to be unconstitutional, we reject appellant's twelfth proposition of law.

## XIII

{¶ 94} Having considered the propositions of law, we must now independently review the death penalty for appropriateness and proportionality. Again, we find that the two specifications of aggravating circumstances appellant was found guilty of committing were proven beyond a reasonable doubt.

{¶ 95} In mitigation, appellant presented the testimony of his mother, grandmother, and two sisters. These witnesses testified concerning the difficult circumstances surrounding appellant's childhood. Testimony established that throughout appellant's childhood, Pete Biros, appellant's father, was a domineering and tyrannical man who treated his family as property. Pete Biros belittled and berated his wife and children, showed them little or no affection, and isolated them from family and friends. He was an extremely jealous man who frequently accused Jo Anne Biros, appellant's mother, of infidelity, and oftentimes threatened to kill

her and to commit suicide. Pete Biros died in October 1983 from cirrhosis of the liver. Despite being raised in a household with Pete Biros, appellant and his sisters, along with Jo Anne Biros, worked steadily and succeeded in eventually graduating from college. Appellant's family members testified that appellant is a helpful, caring, and conscientious individual with a "good heart."

{¶ 96} Dr. James Eisenberg, a psychologist, testified in mitigation. Eisenberg first interviewed appellant in March 1991. Between that time and the time of the mitigation hearing, Eisenberg interviewed appellant on several occasions, performed psychological testing, reviewed appellant's records, and interviewed members of appellant's family. Eisenberg noted that appellant had come from an "extremely dysfunctional family," and believed that appellant's relationship with his father had significantly affected his life and personality. Eisenberg testified that while appellant was gutting and dismembering Tami's body, appellant was mentally reenacting scenes from when he hunted deer with his father and would have to slaughter the kill while being told that he was worthless and incompetent. Eisenberg diagnosed appellant as suffering from a "schizoid personality disorder," and from lifelong alcohol dependence and neurotic depression. Eisenberg also testified that appellant had graduated from college after having worked toward obtaining a degree for thirteen years. According to Eisenberg, this indicates that appellant has been able to persevere despite the trying circumstances of his youth. Further, Eisenberg noted that appellant had been employed throughout most of his adult life, that appellant had no significant history of prior criminal convictions, and that between February 1991 and the time of trial, appellant had no reported problems in the Trumbull County Jail. Prior to the offenses in the case at bar, appellant's only known criminal history consisted of one arrest for theft in 1977 and a 1986 conviction for either driving under the influence of alcohol or for reckless operation of a motor vehicle. Eisenberg testified that appellant was not insane at the time of trial or at the time of the killing.

**{¶ 97}** On cross-examination, Eisenberg testified that appellant knows the difference between right and wrong. Eisenberg also testified that, in his opinion, the mitigating factor set forth in R.C. 2929.04(B)(3) is inapplicable in this case. Therefore, Eisenberg admitted that, at the time of the killing, appellant's psychological conditions did *not* rise to the level of a mental disease or defect that deprived appellant of a substantial capacity to appreciate the criminality of his conduct or to conform to the requirements of law.

**{¶ 98}** Finally, appellant gave an unsworn statement in which he admitted responsibility for the death of Tami Engstrom "and what happened afterwards." Appellant apologized to the victim's family and to his own family for what he had done.

**{¶ 99}** Upon a review of the evidence presented in mitigation, it is clear to us that appellant had a troubled childhood. We find that appellant's troubled childhood, history, and family background are entitled to some, but very little, weight in mitigation.

**{¶ 100}** The nature and circumstances of the offense reveal nothing of any mitigating value. The R.C. 2929.04(B)(1) and (2) mitigating factors are inapplicable on the record before us, since there exists no credible evidence that the victim induced or facilitated the murder (R.C. 2929.04[B][1]), and there exists no credible evidence that appellant acted under duress, coercion, or strong provocation (R.C. 2929.04[B][2]). Further, the R.C. 2929.04(B)(6) mitigating factor is inapplicable, since appellant was the principal and only offender.

**{¶ 101}** The R.C. 2929.04(B)(3) mitigating factor was not established by a preponderance of the evidence. Nevertheless, we find that appellant's personality disorder, lifelong alcohol dependence, and depression, as testified to by Dr. Eisenberg, are collectively entitled to some, but very little, weight in mitigation.

{¶ 102} We have considered the R.C. 2929.04(B)(4) mitigating factor (youth of the offender), but find that this factor is entitled to no weight in mitigation. Appellant was thirty-two years of age at the time of the offense.

{¶ 103} The record is clear that appellant lacks a significant history of prior criminal convictions and delinquency adjudications. We find that this R.C. 2929.04(B)(5) mitigating factor is entitled to some weight in mitigation. Additionally, we find that the evidence of appellant's steady work record and his achievement in obtaining a college degree after thirteen years of effort is entitled to some, but very minimal, weight in mitigation. We assign little or no weight to appellant's unsworn statement wherein he apologized to the victim's family and to his own family and accepted responsibility for the death of Tami Engstrom.

{¶ 104} We have also considered whether this appellant might be capable of long-term rehabilitation and ultimate reintegration into society after lengthy incarceration, given his favorable work record, his college degree, and his lack of a significant prior criminal history. However, the acts of sheer inhumanity demonstrated by this appellant in the nature and circumstances of the offense convince us that he is incapable of any meaningful rehabilitation. Additionally, we have considered Eisenberg's testimony that appellant did well in a controlled institutionalized setting between the time of his arrest and the time of trial. We assign this evidence little or no weight in mitigation.

{¶ 105} Weighing the evidence presented in mitigation against the two R.C. 2929.04(A)(7) specifications of aggravating circumstances of which appellant was found guilty, we find that the aggravating circumstances easily outweigh the mitigating factors beyond a reasonable doubt. Indeed, even if, as appellant suggests, there existed insufficient evidence to support a finding that the murder occurred while appellant was committing or while fleeing immediately after committing aggravated robbery (a proposition we have specifically rejected but one that was accepted by the court of appeals), our conclusion would remain the same.

The court of appeals held, and we agree, that the aggravating circumstance that the killing occurred while appellant was attempting to commit or while fleeing immediately after attempting to commit rape itself outweighs the mitigating factors beyond a reasonable doubt.

{¶ 106} Finally, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously affirmed the death penalty. We have previously upheld the death sentence in cases involving murder during the course of an aggravated robbery (see, *e.g.*, *State v. Berry* [1995], 72 Ohio St.3d 354, 650 N.E.2d 433; *Woodard*, 68 Ohio St.3d 70, 623 N.E.2d 75; *State v. Hawkins* [1993], 66 Ohio St.3d 339, 612 N.E.2d 1227; and *State v. Montgomery* [1991], 61 Ohio St.3d 410, 575 N.E.2d 167), in cases involving murder during the commission of an attempted rape (see, *e.g.*, *Scudder*, 71 Ohio St.3d 263, 643 N.E.2d 524), and in cases involving murder during the commission of an aggravated robbery and rape (see, *e.g.*, *Smith*, 61 Ohio St.3d 284, 574 N.E.2d 510). Appellant's death sentence is neither excessive nor disproportionate in comparison.

{¶ 107} For the foregoing reasons, we affirm the judgment of the court of appeals in part and reverse it in part. Specifically, we affirm appellant's convictions and sentences, including the death sentence, but reverse the judgment of the court of appeals on the issues raised in the cross-appeal.

*Judgment affirmed in part and reversed in part.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

––––––––––––––––