[Cite as *State v. Meadows*, 2022-Ohio-287.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 20CA3734 |
| | : | |
| v. | : | |
| | : | DECISION AND |
| JEFFREY MEADOWS, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | |

_____
APPEARANCES:

Roger Soroka and Joshua Bedtelyon, Soroka & Associates, LLC, Columbus, Ohio, for Appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela C. Wells, Assistant Ross County Prosecuting Attorney, Chillicothe, Ohio, for Appellee.
_____

Smith, P.J.

{¶1} This is an appeal from a Ross County Common Pleas Court judgment entry convicting Appellant, Jeffrey Meadows, of one count of aggravated possession of drugs, a second-degree felony in violation of R.C. 2925.11, and sentencing him to serve a minimum prison term of two years and a maximum prison term of three years.  On appeal, Meadows contends 1) that the trial court erred in denying his motion to suppress evidence obtained during an unlawful search and seizure of his vehicle; and 2) that the trial court erred in sentencing him

to an indefinite prison term pursuant to the Reagan Tokes Act, in violation of his constitutional rights.  However, because we find no merit to the arguments raised under these assignments of error, they are both overruled.  Accordingly, the judgment of the trial court is affirmed.

FACTS

{¶2} This matter stems from the traffic stop of Jeffrey Meadows by Ohio State Highway Patrol Trooper Atwood in Ross County, Ohio, on US 23 South during the afternoon of August 29, 2019.  The record before us reveals that Trooper Atwood was sitting stationary on US 23 observing southbound traffic when he noticed Meadows' vehicle pass by.  The record indicates that the trooper noticed a loud and unusual sound emanating from the vehicle, and he also noticed Meadows sitting rigidly in the driver's seat, leaning up towards the steering wheel. Upon observing Meadows' vehicle pass by, Trooper Atwood then observed Meadows' vehicle travel over the solid white line by over a tire width until it was out of sight.

{¶3} Trooper Atwood pulled out and eventually caught up with Meadows. Upon catching up with him, he observed Meadows move from the left lane to the right lane without signaling.  After confirming Meadows' vehicle was, in fact, the vehicle that passed by that was making a loud noise, Trooper Atwood activated his lights and initiated a traffic stop.  Upon stopping, Meadows can be seen on the

cruiser video making a slight jerking motion to the right. As Trooper Atwood approached the passenger side of the vehicle, he asked Meadows if he was "shoving" something. Although it cannot be deciphered on the dash cam video, apparently Meadows told the trooper that he took out his "grill" (gold teeth covering) and put it in the cup holder.

{¶4} In addition to Meadows, there were two female passengers in the vehicle. Trooper Atwood asked Meadows to step out of the vehicle and when he did, it appears from the video that something may have fallen, to which Trooper Atwood responded by asking Meadows if that was his "burner." Meadows responded in the negative and could not produce a driver's license or identification card. Trooper Atwood thereafter took him to the front of his cruiser where he patted him down. He then placed Meadows in the front seat and proceeded to ask him for identifying information, including his social security number, in order to run it through the system. He also asked him who owned the vehicle. There was some confusion over who the owner was.[1] As such, Trooper Atwood moved Meadows to the back seat, which he explained was a safety precaution. Meadows was not handcuffed at this time, although the door was shut and the window was open. Trooper Atwood then went to speak with the passengers in the vehicle. Both passengers denied ownership of the vehicle.

---

[1] Meadows stated the vehicle was owned by his "peoples."

{¶5} Trooper Atwood then came back and informed Meadows both passengers denied ownership of the vehicle. Meadows then told Trooper Atwood it was his vehicle and that he had told him that to begin with. Trooper Atwood disagreed and asked for consent to search the vehicle. Verbal consent was given by Meadows. By that time, backup had arrived and Trooper Boetcher stood by Meadows as he was seated in the cruiser while Trooper Atwood searched the vehicle. During the search of the vehicle Trooper Atwood located what was later determined to be 90 grams of methamphetamine rolled up in a sock behind a loose trim panel in the center console of the vehicle. A cell phone was located there as well. At that time Trooper Atwood returned to his cruiser and placed Meadows in handcuffs and read him his *Miranda* rights.[2] After being mirandized, Meadows stated "I just get high." Trooper Atwood thereafter seized another cell phone and $1200.00 cash in small bills from Meadows' person. Search warrants were issued for forensic examinations of both phones. There is nothing in the record that indicates what evidence, if any, was recovered from the forensic review of the cell phones. Meadows was initially charged in the Chillicothe Municipal Court with one count of drug trafficking and one count of possession of drugs.

{¶6} After being bound over to the common pleas court, however, Meadows was only indicted on one count of aggravated possession of drugs on December 6,

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2019.  On February 11, 2020, Meadows filed a motion to suppress all evidence and statements obtained as a result of the stop, which he claimed was not supported by reasonable suspicion or probable cause.  He also claimed that the issuance of the search warrants for the cell phones was not supported by probable cause, and he further argued that the warrants that were issued were overbroad and lacked particularity.  A hearing on the motion to suppress was held on June 4, 2020.  After considering the evidence presented at the hearing as well as arguments made in post-hearing briefs, the trial court denied the motion on July 16, 2020.  Thereafter, Meadows entered a plea of no contest to the sole count of the indictment and was convicted and sentenced to a minimum two-year prison term and a maximum three-year prison term on December 10, 2020.  It is from this order that Meadows now brings his timely appeal, setting forth two assignments of error for our review.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED DURING AN UNLAWFUL SEARCH AND SEIZURE OF HIS VEHICLE.

{¶7} In his first assignment of error, Meadows contends the trial court erred in denying his motion to suppress the evidence that was obtained after what he describes as an unlawful search and seizure of his vehicle.  He raises four arguments under this assignment of error.  He first argues that the trial court erred in denying his motion to suppress the evidence that was obtained after a traffic stop

which he contends was not supported by probable cause or reasonable suspicion.

Second, he argues that the trial court erred in denying his motion to suppress the

evidence that was obtained with a search warrant which he claims lacked sufficient

particularity and was overbroad.  Third, he argues the trial court erred in denying

his motion to suppress the statements that were obtained during the traffic stop,

which he claims were obtained in violation of his Fifth and Sixth Amendment

rights.  Fourth, he argues the trial court erred in denying his motion to suppress the

evidence that he claims was obtained with a search warrant that lacked probable

cause.

## Standard of Review

{¶8} Generally, "appellate review of a motion to suppress presents a mixed

question of law and fact." *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-

1574, 10 N.E.3d 691, ¶ 7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-

5372, 797 N.E.2d 71, ¶ 8.  The Supreme Court of Ohio has explained as follows:

> When considering a motion to suppress, the trial court assumes
> the role of trier of fact and is therefore in the best position to
> resolve factual questions and evaluate the credibility of
> witnesses.  Consequently, an appellate court must accept the trial
> court's findings of fact if they are supported by competent,
> credible evidence. Accepting these facts as true, the appellate
> court must then independently determine, without deference to
> the conclusion of the trial court, whether the facts satisfy the
> applicable legal standard.

(Citations omitted.)  *Burnside* at ¶ 8.

Legal Analysis

{¶9} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15. The Supreme Court of Ohio has held that these provisions provide the same protection in felony cases. *State v. Hawkins*, 158 Ohio St.3d 94, 2019-Ohio-4210, 140 N.E.3d 577, ¶ 18. "This constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion at trial of evidence obtained from an unreasonable search and seizure." *State v. Petty*, 4th Dist. Washington Nos. 18CA26 and 18CA27, 134 N.E.3d 222, 2019-Ohio-4241, ¶ 11.

{¶10} " '[S]earches [and seizures] conducted outside the judicial process, without prior approval by [a] judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' " (Citations omitted.) *State v. Conley*, 4th Dist. Adams No. 19CA1091, 2019-Ohio-4172, ¶ 17, quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "Once a defendant demonstrates that he or she was subjected to a warrantless search or seizure, the burden shifts to the state to establish that the warrantless search or seizure was constitutionally permissible." *State v. Dorsey*, 4th Dist. Scioto No. 19CA3874, 2019-Ohio-3478,

¶ 13. In this case, it is clear that Trooper Atwood acted without a warrant in initiating the traffic stop at issue.

### The Initial Stop

{¶11} Meadows first argues under this assignment of error that the initial stop of his vehicle was not supported by reasonable suspicion or probable cause. Meadows raises several arguments challenging the initial stop. First, he argues that Trooper Atwood's observation of him "sitting and leaning toward the steering wheel 'rigidly[]' " did not give him reasonable suspicion for the traffic stop. He next argues that Trooper Atwood's observation of a "noisy exhaust" failed to provide reasonable suspicion for the stop because "[t]here is no examination tool used to measure the noise level of an exhaust for this violation[,]" and thus, "Trooper Atwood's assertion that the exhaust was unusually loud is entirely based on his 'knowledge, experience, and training." He argues that although officers have some discretion in their judgment regarding what constitutes a loud exhaust, the cruiser video failed to demonstrate the exhaust was loud or provide reasonable suspicion for the stop. Meadows further argues that although Trooper Atwood noted he observed Meadows' vehicle travel over the "hashed line by an entire tire width" and also fail to signal before changing lanes, Trooper Atwood admitted that neither of these violations appeared on the cruiser video.

{¶12} The record before us indicates that this case involved an investigatory stop. Investigatory stops "must be supported by a reasonable, articulable suspicion that the driver has, is, or is about to commit a crime, including a minor traffic violation." *Petty* at ¶ 12, citing *State v. Hudson*, 4th Dist. Gallia No. 17CA19, 2018-Ohio-2717, ¶ 14, and *State v. Fowler*, 4th Dist. Ross No. 17CA3599, 2018-Ohio-241, ¶ 16, in turn citing *United States v. Williams*, 525 Fed.Appx. 330, 332 (6th Cir.2013) and *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In *Petty*, *supra*, we recently explained as follows:

> "To justify a traffic stop based upon reasonable suspicion, the officer must be able to articulate specific facts that would warrant a person of reasonable caution to believe that the driver has committed, or is committing, a crime, including a minor traffic violation." *State v. Taylor*, 2016-Ohio-1231, 62 N.E.3d 591, ¶ 18 (4th Dist.). The existence of reasonable suspicion depends on whether an objectively reasonable police officer would believe that the driver's conduct constituted a traffic violation based on the totality of the circumstances known to the officer at the time of the stop. *Id.*

> Moreover, a police officer may stop the driver of a vehicle after observing even a de minimis violation of traffic laws. *See State v. Williams*, 4th Dist. Ross No. 14CA3436, 2014-Ohio-4897, 2014 WL 5513050, ¶ 9, citing *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), and *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996), syllabus. "[A] traffic stop with the proper standard of evidence is valid regardless of the officer's underlying ulterior motives as the test is merely whether the officer 'could' have performed the act complained of; pretext is irrelevant if the action complained of was permissible." *See State v. Koczwara*, 7th Dist. Mahoning No. 13MA149, 2014-Ohio-1946, 2014 WL 1877464, ¶ 22, citing *Erickson* at 7 and 11, 665 N.E.2d 1091.

*Petty* at ¶ 12-13.

{¶13} Furthermore, " ' "[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." ' " *State v. Strong*, 4th Dist. Ross No. 18CA3663, 2019-Ohio-2888, ¶ 19, quoting *State v. Eatmon*, 4th Dist. Scioto No. 12CA3498, 2013-Ohio-4812, ¶ 13, in turn quoting *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044, paragraph one of the syllabus (1980).  The totality of the circumstances approach " 'allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." ' " *Strong* at ¶ 19, quoting *United States v. Arvizu*, 534 U.S 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (overruled in part on separate grounds by *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in turn quoting *U.S. v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

{¶14} In *State v. Bennett*, 4th Dist. Pickaway No. 20CA4, 2021-Ohio-937, ¶ 12, this Court was confronted with an argument that a trooper lacked reasonable suspicion to initiate a traffic stop when the initial behavior that caught the trooper's attention consisted of "the driver sitting too close to the steering wheel," which is not a violation of any traffic law.  This Court upheld the stop, in part, because along with noticing the driver being positioned very close to the steering wheel, the

trooper also observed a violation of R.C. 4503.21(A), which governs the display of license plates. *Id.* at ¶ 14. Similarly, in the present case, Trooper Atwood noticed Meadows' position in the driver's seat while also observing that his vehicle had a loud exhaust. R.C. 4513.22 provides that "every motor vehicle * * * with an internal combustion engine shall at all times be equipped with a muffler which is in good working order and in constant operation to prevent excessive or unusual noise, * * *." Further, this Court has previously held that observation of a loud exhaust provides sufficient reasonable suspicion to justify a traffic stop and Meadows concedes this fact on appeal. *State v. Birchfield*, 4th Dist. Ross No. 97CA2281, 1997 WL 531231, *5.

{¶15} Here, Trooper Atwood specifically testified during the suppression hearing that Meadows' vehicle was producing an excessive and unusual noise. During his testimony, he explained that he was stationary on US 23 when Meadow's vehicle passed by. He testified that as Meadows' vehicle passed by, he "observed * * * an excessive and load [sic] and unusual exhaust violation coming from his vehicle." Trooper Atwood also testified that at that time, he also noticed Meadows was "sitting rigid in his seat, he was leaned up towards the steering wheel." He testified he believed that to be unusual compared to all the other traffic. Trooper Atwood further testified that once Meadows passed by, his vehicle "traveled over the solid white, fault [sic] line to the right by over a tire width[,]"

and it continued over the line until it was out of sight over a hill.  Based upon his observations, Trooper Atwood pulled out and pursued Meadows' vehicle.

{¶16} Trooper Atwood then testified that as he caught up with Meadows' vehicle, he observed Meadows change from the left lane to the right lane without signaling.  After catching up with Meadows and confirming Meadows' vehicle to be the vehicle with the loud exhaust, he initiated a traffic stop.  On cross-examination, Trooper Atwood testified that the recording system in his cruiser starts when he activates his lights; however, he further testified upon cross-examination that although the sound of Meadows' exhaust could not be distinguished on the video, that it was a lot louder than the other vehicles, based upon his training and experience, and that it was actually making "a loud gurgling" sound.  As set forth above, Trooper Atwood was entitled to rely on his experience and training in making determinations regarding a loud exhaust violation.  Further, the trial court was in the best position to make a credibility determination regarding this testimony.

{¶17} Additionally, R.C. 4511.33(A)(1) governs rules for driving in marked lanes and requires that all vehicles "be driven, as nearly as is practicable entirely within a single lane or line of traffic * * *."  A marked lanes violation constitutes a de minimis violation of traffic law and provides justification for an investigatory stop. *See State v. Alexander-Lindsey*, 2016-Ohio-3033, 65 N.E.3d 129, ¶ 11.

Finally, R.C. 4511.39(A) governs the use of signals for moving left or right and provides that "[n]o person shall * * * move right or left upon a highway * * * without giving an appropriate signal in the manner hereinafter provided." As with the loud exhaust, Trooper Atwood also conceded that the lane violations were not visible on the video.

{¶18} However, "[t]he trier of fact is free to believe all, part, or none of the testimony of any witness[.]" *State v. Hammond*, 4th Dist. Ross No. 18CA3662, 2019-Ohio-4253, ¶ 56. Further, we must accord deference to the trier of fact on credibility issues because "it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *Id.* Moreover, while the video footage does not support Trooper Atwood's testimony about the traffic violations, the footage also does not contradict his testimony. *See generally State v. Shisler*, 1st Dist. Hamilton Nos. C-050860, C-050861, C-050878, and C-050879, 2006-Ohio-5265, ¶ 2-3, 6 (deferring to trial court's finding that officer's testimony that she observed a marked lanes violation at a particular intersection was credible even though the video footage did not show the violation due to the camera angle, the officer's report did not mention the violation, the officer only cited the driver for weaving at a different intersection, and the video footage did not reflect that the driver had been weaving at that location).

{¶19} Here, the record before us indicates that upon being asked why he was stopped, Trooper Atwood advised Meadows that he stopped him for having a loud exhaust, a marked lanes violation, and a turn signal violation. It further appears from the record before us that the initial observation of the loud exhaust, as well as the marked lanes violation, likely occurred prior to the time the video would have started recording. Also, a review of the cruiser video reveals that there is excessive traffic and road noise throughout the stop that renders it very difficult to hear or differentiate where noise is specifically coming from. As set forth above, the trial court was free to believe Trooper Atwood's testimony that he observed a loud exhaust, as well as a marked lanes violation and turn signal violation, even though these violations could not be confirmed on review of the cruiser video and, moreover, any single one of these violations, although de minimis, would have provided sufficient reasonable suspicion for Trooper Atwood to initiate a traffic stop. As such, we cannot conclude that the trial court erred in denying Meadows' motion to suppress based upon the ground that the initial investigatory stop was invalid.

Investigatory Detention

{¶20} After arguing that the initial stop was not supported by reasonable, articulable suspicion, Meadows goes on to argue on appeal that he was unreasonably detained when Trooper Atwood expanded the scope of the initial

stop. However, Meadows did not raise this argument in his underlying suppression motion, nor did he raise this argument in his post-hearing brief. In fact, the only reference Meadows' underlying motion makes to being "unreasonably detained" is made as part of his separate argument that his statements should be suppressed based upon a *Miranda* violation, which we will address more fully below.

{¶21} "It is well settled that issues not raised in an original motion to suppress cannot be raised for the first time on appeal." *State v. Jones*, 4th Dist. Highland No. 04CA9, 2005-Ohio-768, ¶ 18. *See also State v. Markins*, 4th Dist. Scioto No. 10CA3387, 2013-Ohio-602, ¶ 25; *State v. Daboni*, 4th Dist. Meigs Nos., 18CA3, 18CA4, 18CA5, 2018-Ohio-4155, ¶ 16. As we stated in *Jones*, this is no mere technicality. *Jones* at ¶ 18. Crim.R. 47 requires a motion to suppress to "state with particularity the grounds upon which it is made and [to] set forth the relief or order sought." *State v. Rife*, 4th Dist. Ross No. 11CA3276, 2012-Ohio-3264, ¶ 17. "These requirements exist because 'the prosecutor cannot be expected to anticipate the specific legal and factual grounds upon which the defendant challenges the legality of a warrantless search.' " *Id.*, quoting *Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988). Here, because issues related to the scope and length of Meadows' investigatory detention were not raised below, we will not consider this portion of his assignment of error.

Suppression of Statements

{¶22} Meadows also argues under his first assignment of error that the trial court erred in denying his motion to suppress the statements that he contends were obtained in violation of his Fifth and Sixth Amendment constitutional rights. Meadows argues that the question presented here is whether a reasonable person in his position would have understood himself to be in custody while being questioned in the front seat of the police vehicle. He further argues that Trooper Atwood "set the tone of intimidation from the first interaction" because he was a "uniformed state trooper in a marked vehicle," and by immediately accusing Meadows of shoving something near the center console and then asking him if that was his "burner" he just dropped when he exited the vehicle.

{¶23} He points to additional factors present as well, including the fact that Trooper Atwood removed him from his vehicle and patted him down less than two minutes after initiating the stop, as well as the fact that the trooper then placed him in the front seat of the cruiser with the door closed and began asking him questions. Meadows contends that a reasonable person in his situation would have understood himself to be in custody during this questioning from the trooper. He further argues that he was in custody when Trooper Atwood moved him to the back seat of the cruiser, with an open window but with doors that only open from the outside, and left him guarded by a second trooper while he was searching the vehicle. Meadows argues that Trooper Atwood made further "accusations" about

weapons being in the vehicle when he was seated in the back of the cruiser. Meadows argues that any and all statements made during this time were elicited during a custodial interrogation in violation of his *Miranda* rights, and because the questioning occurred without a lawyer, that his Sixth Amendment right to counsel was also violated.

{¶24} The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." To safeguard a suspect's Fifth Amendment privilege against self-incrimination, law enforcement officers seeking to perform a custodial interrogation must warn the suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, supra, at 479. In the absence of these warnings, a suspect's incriminatory statements made during a custodial interrogation are inadmissible at trial. *See Michigan v. Mosley*, 423 U.S. 96, 99-100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) ("[U]nless law enforcement officers give certain specified warnings before questioning a person in custody [], and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a

defendant at trial, even though the statement may in fact be wholly voluntary"),

citing *Michigan v. Tucker*, 417 U.S. 433, 443, 94 S.Ct. 2357, 2363, 41 L.Ed.2d 182

(1974). *See also Miranda* at 479 (stating that no evidence stemming from the

result of a custodial interrogation may be used against defendant unless procedural

safeguards employed); *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9

N.E.3d 930, ¶ 113 (stating that "the prosecution may not use statements, whether

exculpatory or inculpatory, stemming from custodial interrogation of the defendant

unless it demonstrates the use of procedural safeguards effective to secure the

privilege against self-incrimination"). Moreover, under Section 10, Article I of the

Ohio Constitution "evidence obtained as the direct result of statements made in

custody without the benefit of a *Miranda* warning should be excluded." *State v.*

*Farris*, 109 Ohio St.3d 519, 529, 2006-Ohio-3255, 849 N.E.2d 985, 996, ¶ 49.

{¶25} However, *Miranda* does not protect every individual who is subjected

to police questioning. *See State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430,

811 N.E.2d 48, ¶ 26; *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891

(1997); citing *Oregon v. Mathiason*, 429 U.S. 492, 494, 97 S.Ct. 711, 50 L.Ed.2d

714 (1977). " 'Nor is the requirement of warnings to be imposed simply because *

* * the questioned person is one whom the police suspect.' " *Biros* at 440, quoting

*Mathiason* at 494. Instead, "[o]nly *custodial* interrogation triggers the need for

*Miranda* warnings." (Citations omitted). *Biros* at 440. (citations omitted).

{¶26} *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra,* at 444. *Accord Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Mathiason, supra ,*at 495 (stating that the *Miranda* protection attaches "only where there has been such a restriction on a person's freedom as to render him in 'custody' "). In Ohio, it has consistently been stated that "[i]n order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). *Accord J.D.B. v. North Carolina*, 564 U.S. 261, 131 S.Ct. 2394, 2402, 180 L.Ed.2d 310 (2011).

{¶27} However, in a more recent decision, the Supreme Court of Ohio has now held that the test is not whether a reasonable person believes himself or herself to be free to leave, but rather the relevant inquiry is "whether a reasonable person in the suspect's position would have understood himself or herself to be in

custody." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 30 (2017). In announcing this new test, the Court reasoned as follows:

> This nuance is important and well reasoned. If the inquiry were whether the driver felt free to leave, then every traffic stop could be considered a custodial interrogation because "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so[.]" [*Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).] And a law-enforcement officer, in the midst of investigating a traffic stop and performing all its attendant procedures, would not consider a driver free to leave unless given permission. But 'not free to leave' and 'in custody' are distinct concepts.

*Id.*

{¶28} The Court further reasoned as follows:

> For purposes of constitutional privilege against self-incrimination, the test is not whether the individual feels free to leave but whether the situation "exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights."

*Id.* at ¶ 31; quoting *Berkemer* at 437.

Ultimately, in *Cleveland v. Oles,* based on the totality of the circumstances the court found that the suspect was not in custody and that no constitutional violation occurred. *Cleveland v. Oles* at ¶ 33. In that case, the suspect was stopped, was asked to step out of the vehicle and sit in the front seat of the patrol car, and was questioned regarding his destination and how much alcohol he had consumed that evening. *Id.* at ¶ 2-4. He was also directed to perform field

sobriety tests, failed the tests, and was arrested, all without receiving *Miranda* warnings. *Id.*

{¶30} Further, the Supreme Court of Ohio has held that an individual temporarily detained as part of a routine traffic or investigatory stop ordinarily is not in custody and is therefore not entitled to *Miranda* warnings. *See State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 13, citing *Berkemer*, *supra*, at 439-440 (noting that investigative stops are not subject to *Miranda* requirements and holding that *Miranda* was not implicated during traffic stop for swerving when officer questioned driver about his drinking).  Thus, " 'most traffic stops and accompanying investigatory questioning do not constitute custodial interrogations warranting the right to *Miranda* warnings.' " (Citations omitted). *State v. Casteel*, 2017-Ohio-8303, 98 N.E.3d 889 (4th.Dist 2017), quoting *State v. Brocker*, 11th Dist. Portage No. 2014-P-0070, 2015-Ohio-3412, ¶ 17. *See also State v. Jackson*, 9th Dist. Summit Nos. 27132, 27200, 27133, 27158, 2015-Ohio-5246 (determining that *Miranda* did not apply to traffic stop during which officer asked defendant where he had been and whether he had purchased any items at the store where he had been); *State v. Campbell*, 2nd Dist. Montgomery No. 26497, 2015-Ohio-3381 (determining that *Miranda* not implicated during investigative stop to ascertain whether eighteen-year-old defendant had been drinking when there was no evidence that defendant was

handcuffed, and the defendant was not informed that he was under arrest or detained in police car); *State v. Smoot*, 2015-Ohio-2717, 38 N.E.3d 1094, 1112-1113, ¶ 41 (determining that defendant was not in custody for purposes of *Miranda* when officer asked defendant about the contents of his vehicle during traffic stop); *State v. Vineyard*, 2nd Dist. Montgomery No. 25854, 2014-Ohio-3846 (determining that defendant was not in custody during traffic stop even though officer asked defendant to exit his vehicle and asked defendant whether he had any weapons); *State v. Ware*, 8th Dist. Cuyahoga No. 89945, 2008-Ohio-2038 (concluding that *Miranda* was not applicable during a routine traffic stop in which officer asked defendant if he had any weapons, drugs, or contraband in the vehicle); *State v. Leonard*, 1st Dist. Hamilton No. C-060595, 2007-Ohio-3312 (holding that *Miranda* warnings were not required when an officer removed defendant from his vehicle and placed defendant in front passenger seat of officer's patrol vehicle for questioning).

{¶31} However, as explained in *Farris*, *supra*, during a traffic or investigative stop circumstances may change and render an individual "in custody" for practical purposes and, thus, " 'entitled to the full panoply of protections prescribed by *Miranda*.' " *Farris* at ¶ 13; quoting *Berkemer* at 440. "The determination of whether a suspect is in custody presents a mixed question of fact and law." *State v. Dukes*, 4th Dist. Scioto Nos. 16CA3745 and 16CA3760, 2017-

Ohio-7204, ¶ 45, citing *In re R.H.*, 2nd Dist. Montgomery No. 22352, 2008-Ohio-773, ¶ 15.  Thus, " '[w]e defer to the court's findings of fact, when articulated, but evaluate de novo whether on those facts, [the suspect] was in custody.' "  *Id.*  Here, the trial court denied Meadows' motion to suppress without providing findings of fact or conclusions of law and without setting forth its reasoning.  However, implicit in the trial court's denial of the motion is the trial court's determination that Meadows was not "in custody" for purposes of *Miranda*.

{¶32} We initially note that during a valid traffic stop, officers may order the occupants out of a vehicle pending completion of the stop without violating the Fourth Amendment.  *State v. Dorsey*, 4th Dist. Scioto No. 19CA3874, 2019-Ohio-3478, ¶ 15, citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111, fn. 6, 985 S.Ct. 330, 54 L.Ed.2d 331 (1977).  *See also Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).  As set forth above, we have already determined that the traffic stop at issue was valid.  As such, Trooper Atwood was permitted to remove Meadows from the vehicle.  We also note that once a lawful traffic stop has been made, law enforcement officers may conduct a limited protective search for concealed weapons if an officer reasonably believes that a suspect may be armed or a danger to the officer or to others.  *See State v. Evans*, 67 Ohio St.3d 405, 414, 618 N.E.2d 162 (1993).  Here, Trooper Atwood testified that upon initiating the stop of Meadows' vehicle, he observed Meadows making what were essentially

furtive movements, which he described as "shoving" something in the area of the center console of the vehicle. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Evans* at 422, citing *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Based upon the record before us, we conclude the pat-down search for weapons was also valid.

{¶33} Meadows contends, however, that he was in custody for purposes of *Miranda* essentially from the point Trooper Atwood initially approached him in light of the fact that Trooper Atwood's initial encounter with him consisted of asking Meadows what he was "shoving" and whether something he dropped as he was exiting the vehicle was his "burner." He further argues that he was in custody when he was placed in the cruiser and questioned about his identity, where he was heading towards and coming from, the ownership of the vehicle, and whether there were any weapons in the vehicle.[3]

{¶34} Contrary to Meadows' arguments, in light of the foregoing case law coupled with a review of the record before us, we conclude that the evidence presented at the suppression hearing failed to establish that Meadows was in custody at any point during the encounter with law enforcement until he was

---

[3]Although Meadows describes the encounter consisting of Trooper Atwood accusing him of having a weapon in the vehicle, a review of the video indicates that Trooper Atwood simply asked him if there were any weapons in the vehicle, to which Meadows responded there were not.

actually handcuffed and *Mirandized*. This occurred upon Trooper Atwood finding what appeared to be methamphetamine concealed behind a trim panel of his center console. We note that this was found in connection with a consent search, the consent for which was not challenged at the trial court level. Furthermore, the record reveals that Meadows did not make any incriminating statements until after he was read his *Miranda* rights. Prior to being mirandized he simply answered questions regarding his identity, his destination, the ownership of his vehicle, and whether there were any weapons in the car. He denied "shoving" anything while sitting in the car. The fact that those questions were asked and answered did not convert an investigative stop and detention for a traffic violation into a situation where Meadows could be considered "in custody" for purposes of *Miranda.*

{¶35} Because we have determined that Meadows was not in custody for purposes of triggering a *Miranda* warning, and further because we have found that he made no incriminating statements during the encounter in question until after he had already been *Mirandized*, we find no merit to this argument raised under his first assignment of error. Thus, we cannot conclude that the trial court erred in denying the motion to suppress based upon the ground that his statements were obtained in violation of his Fifth and Sixth Amendment rights.

Issuance of Search Warrant for Cell Phones

{¶36} Meadows raises two arguments under this assignment of error related to the seizure and subsequent search of the contents of his two cell phones. First, he argues that the trial court erred in denying his motion to suppress evidence obtained from his cell phones, which he argues was obtained with a search warrant that lacked particularity. More specifically, he argues that the search warrant that was issued for the search of his cell phones was overly broad and that all evidence discovered through the use of the search warrant should have been suppressed. Next, he argues that the trial court erred in denying his motion to suppress evidence because the search warrant for his cell phones lacked probable cause. More specifically, he argues that although drugs were found in his vehicle, "there was nothing found to suggest Drug Trafficking[,]" and that "Trooper Atwood had no factual evidence to be able to infer that the cellphone(s) may contain information regarding Drug Trafficking."

{¶37} A review of the record indicates that Meadows was initially charged, through the filing of a criminal complaint in the Chillicothe Municipal Court, with one count of drug trafficking and one count of possession of drugs. It further appears that although Meadows was initially charged with drug trafficking in the Chillicothe Municipal Court, he was not indicted for drug trafficking in the common pleas court after he was bound over. Instead, he was only indicted for one count of aggravated possession of drugs. Furthermore, when he entered into a

negotiated plea agreement with the State to enter a plea of no contest to the single, unreduced charge, it was not done in exchange for the dismissal of any other charge, but rather, it was done in exchange for a minimum sentencing recommendation by the State.

{¶38} Thus, in our view, arguments related to whether the issuance of the search warrant was justified, as well as arguments related to the scope and breadth or lack of particularity of the search warrant are not relevant to the crime in which Meadows was eventually indicted and convicted. Further, there is no indication from the record before us what evidence resulted from the search of the cell phones or what, if any, impact that evidence had on Meadows' aggravated possession of drugs conviction. Simply put, the evidence, if any, that was recovered from Meadows' cell phones had no relevance to his indictment and conviction for aggravated possession of drugs, which is the only conviction presently before us on appeal. In fact, completely removing the seizure and subsequent search of the cell phones from the picture, Meadows' conviction for aggravated possession of drugs would still be sufficiently supported by the evidence in the record, which includes the fact that 90 grams of methamphetamine were recovered from the vehicle Meadows was driving, coupled with his statement which we have already addressed above indicating he is a drug user.

{¶39} Furthermore, if Meadows was separately indicted for drug trafficking, that matter is not presently before us. As such, we conclude this argument presents an interesting problem not of mootness, but rather, of ripeness, which we discuss in more detail below under Meadows' second assignment of error that challenges the sentence imposed by the trial court. For now, however, we simply note that the Supreme Court of Ohio in *State ex rel. Jones v. Husted*, 149 Ohio St.3d 110, 2016-Ohio-5752, 73 N.E.3d 110, ¶ 21 has observed as follows:

> "In order to be justiciable, a controversy must be ripe for review." *Keller v. Columbus*, 100 Ohio St.3d 192, 2003-Ohio-5599, 797 N.E.2d 964, ¶ 26. A claim is not ripe if it rests on contingent events that may never occur at all. *State v. Booker*, 10th Dist. Franklin No. 15AP-42, 2015-Ohio-5118, 2015 WL 8481555, ¶ 21; *U.S. Bank, N.A. v. 2900 Presidential Drive, L.L.C.*, 2d Dist. Greene No. 2013 CA 60, 2014-Ohio-1121, 2014 WL 1339643, ¶ 32-35.

{¶40} Thus, because these arguments are completely irrelevant to Meadows' aggravated possession of drugs conviction which he is currently appealing, and because any other possible pending charge for drug trafficking is not presently before us, we believe the arguments related to the issuance and scope of the search warrant for the cell phones are not ripe for review. Accordingly, we will not address them.

{¶41} In light of the foregoing, we cannot conclude that the trial court erred in denying Meadows' motion to suppress. Thus, we find no merit to the arguments raised under his first assignment of error and, accordingly, it is overruled.

ASSIGNMENT OF ERROR II

IN HIS SECOND ASSIGNMENT OF ERROR, MEADOWS CONTENDS THAT THE TRIAL COURT ERRED IN SENTENCING HIM TO AN INDEFINITE PRISON TERM PURSUANT TO THE REAGAN TOKES ACT IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS. HE RAISES THREE ARGUMENTS UNDER THIS ASSIGNMENT OF ERROR. HE ARGUES THAT THE TRIAL COURT ERRED IN SENTENCING HIM TO AN INDEFINITE PRISON TERM PURSUANT TO THE REAGAN TOKES ACT 1) IN VIOLATION OF HIS RIGHT TO TRIAL BY JURY; 2) IN VIOLATION OF SEPARATION OF POWERS; AND 3) IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW.

Reagan Tokes Law

{¶42} " 'Senate Bill 201, commonly known as the Reagan Tokes Act, became effective on March 22, 2019. The statute [,R.C. 2929.144,] returns an indefinite sentencing scheme to Ohio for certain qualifying offenses.' " *State v. Walker*, 4th Dist. Washington No. 20CA24, 2021-Ohio-2693, ¶ 18, quoting *State v. Dames*, 8th Dist. Cuyahoga No. 109090, 2020-Ohio-4991, ¶ 2. This Court has further explained as follows regarding this new sentencing framework:

> The Reagan Tokes Law requires that a court imposing a prison term under R.C. 2929.14(A)(1)(a) or (2)(a) for a first or second-degree felony committed on or after March 22, 2019, impose a minimum prison term under that provision and a maximum prison term determined under R.C. 2929.144(B). R.C. 2929.144(C). There is a presumption that the offender "shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C.

2967.271(B). A presumptive earned early release date is a date determined under procedures described in R.C. 2967.271(F) which allow the sentencing court to reduce the minimum prison term under certain circumstances. R.C. 2967.271(A)(2). The ODRC may rebut the presumption if it determines at a hearing that one or more statutorily numerated factors applies. R.C. 2967.271(C). If ODRC rebuts the presumption, it may maintain the offender's incarceration after the expiration of the minimum prison term or presumptive earned early release date for a reasonable period of time, determined and specified by ODRC, that "shall not exceed the offender's maximum prison term." R.C. 2967.271(D)(1).

*State v. Halfhill*, 4th Dist. Meigs No. 20CA7, 2021-Ohio-177, ¶ 8.

## Constitutional Review

{¶43} "The constitutionality of a statute presents a question of law we review de novo." *Id.*, at ¶ 11, citing *Hayslip v. Hanshaw*, 2016-Ohio-3339, 54 N.E.3d 1272, ¶ 27 (4th Dist.). "However, '[i]t is well settled that this court will not reach constitutional issues unless absolutely necessary.' " *Halfhill* at ¶ 11, quoting *State v. Talty*, 103 Ohio St.3d 177, 2004-Ohio-4888, 814 N.E.2d 1201, ¶ 9. Ripeness is a prerequisite to deciding the merits of a constitutional challenge. *See State v. Ramey*, 4th Dist. Washington Nos. 20CA1 and 20CA2, 2020-Ohio-6733, ¶ 20. "Ripeness 'is peculiarly a question of timing.' " *State ex rel. Elyria Foundry Co. v. Indus. Comm.*, 82 Ohio St.3d 88, 89, 1998-Ohio-366, 694 N.E.2d 459, quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Generally, "[a] claim is not ripe for adjudication if it rests upon ' "contingent future events that may not occur as anticipated, or indeed may

not occur at all." ' " *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998), quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), in turn quoting 13A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532, p. 112 (1984).  " 'The basic principle of ripeness may be derived from the conclusion that "judicial machinery should be conserved for problems which are real or present and imminent, not squandered on problems which are abstract or hypothetical or remote." ' " *State v. Walker*, *supra*, at ¶ 19, quoting *Elyria Foundry Co., supra,* at 89, in turn quoting Comment, Mootness and Ripeness: The Postman Always Rings Twice (1965), 65 Colum. L.Rev. 867, 876.

Legal Analysis

{¶44} This Court has repeatedly held that the constitutionality of sentencing pursuant to the Reagan Tokes Law is not yet ripe because on direct appeal an appellant has yet to serve his or her minimum prison term, which is the first instance in which the department of corrections could take any action that affects the length of an appellant's incarceration.  *See Ramey* at ¶ 2; *Halfhill* at ¶ 2; *State v. Hearn*, 4th Dist. Washington No. 20CA7, 2021-Ohio-594, at ¶ 33, 34; *State v. Walker, supra*, at ¶ 20; and *State v. Long*, 4th Dist. Pickaway No. 20CA9, 2021-Ohio-2672, ¶ 13.  Most recently in *Long*, this Court noted that "[t]he question of whether the Reagan Tokes Law is ripe for review is currently pending before the

Supreme Court of Ohio because of the conflict within Ohio appellate districts on the ripeness question." *Long* at ¶ 9, citing *State v. Maddox*, 160 Ohio St.3d 1505, 2020-Ohio-6913, 159 N.E.3d 1150. Further, in *Long* we observed that while *Maddox* has been pending in the Supreme Court, the Eighth District Court of Appeals reversed itself, determining that the Reagan Tokes Law was unconstitutional. *Long* at ¶ 10, citing *State v. Daniel*, 2021-Ohio-1963, —— N.E.3d ——, ¶ 19-20, 26 (8th Dist.) and *State v. Sealey*, 8th Dist. Cuyahoga No. 109670, 2021-Ohio-1949 (in which the Eighth District "reversed course and disagreed with the analogy to Ohio's parole eligibility regimen and instead decided that the Reagan Tokes Law is more akin to parole revocation and reduction of good-time credit proceedings"). We explained that the *Daniel* court "found that the procedures identified in R.C. 2967.271(C) and (D) for rebutting the presumptive release date are constitutionally insufficient because the law, 'as written, does not afford inmates a meaningful hearing, which is the fundamental element of due process required by the liberty interest the statute itself creates.' " *Long* at ¶ 10, quoting *Daniel* at ¶ 31-39, 40.

{¶45} In reaching its decision, the *Daniel* court acknowledged that the director of the ODRC issued policy number 105-PBD-15, effective on March 15, 2021, "establishing procedures for the 'Additional Term Hearing Process' under the Reagan Tokes Law." *Daniel* at ¶ 42. However, finding that the policy was not

in effect at the time the parties brought their appeal, or when they briefed or orally argued their case, the *Daniel* court found the question of "whether the new [ODRC] policy provides due process protections that are absent from the statute[]" was not properly before the court for consideration. *Id.* After considering the reversal of course of the Eight District in both *Daniel* and *Sealy,* as well as the enactment of the new ODRC procedures, this Court held as follows in *Long*:

> Because our district precludes constitutional review of the Reagan Tokes Law for lack of ripeness – and because the ODRC and the Ohio Legislature may adopt additional procedures before any case ripens – we see no need to re-examine our decisions in light of *Daniel* and *Sealey*. To the contrary, the fact that the ODRC promulgated rules that will impact the Eighth District's future constitutional analysis post-*Daniel* further convinces us that our conservative approach is prudent.

*Long* at ¶ 13.

{¶47} Thus, consistent with our most recent reasoning in *Long*, we conclude Meadows' constitutional arguments regarding the prison sentence imposed under the Reagan Tokes Law are precluded from review for lack of ripeness. Accordingly, Meadows' second assignment of error is also overruled.

{¶48} Having found no merit in either of the assignments of error raised by Meadows, they are both overruled. Accordingly, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**

# **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellant.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. and Wilkin, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**